94 N.Y.2d 330 (1999)
725 N.E.2d 598
704 N.Y.S.2d 177
FRANK J. GAIDON, Individually and on Behalf of All Others Similarly Situated, et al., Appellants,
v.
GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Respondent.
PAUL A. GOSHEN, Individually and on Behalf of All Others Similarly Situated, Appellant,
v.
MUTUAL LIFE INSURANCE COMPANY OF NEW YORK et al., Respondents.
Court of Appeals of the State of New York.
Argued October 14, 1999.
Decided December 20, 1999.
*331 *332 Milberg Weiss Bershad Hynes & Lerach, L. L. P., New York City (Melvyn I. Weiss and Barry A. Weprin of counsel), Arnzen, Parry & Wentz, P.S.C., Covington, Kentucky, Bonnett, Fairbourn, Friedman & Balint, P. C., Phoenix, Arizona, Cantilo, Maisel & Hubbard, L. L. P., Dallas, Texas, and James, Hoyer & Newcomer, P.A., Tampa, Florida, for appellants in the first above-entitled action.
*333 Skadden, Arps, Slate, Meagher & Flom, L. L. P., New York City (Thomas J. Dougherty and James R. Carroll of counsel), for respondent in the first above-entitled action.
*334 Milberg Weiss Bershad Hynes & Lerach, L. L. P., New York City (Melvyn I. Weiss and Barry A. Weprin of counsel), Arnzen, Parry & Wentz, P.S.C., Covington, Kentucky, Bonnett, Fairbourn, Friedman & Balint, P. C., Phoenix, Arizona, Cantilo, Maisel & Hubbard, L. L. P., Dallas, Texas, and James, Hoyer & Newcomer, P.A., Tampa, Florida, for appellant in the second above-entitled action.
*335 Dewey Ballantine, L. L. P., New York City (Harvey Kurzweil, Richard W. Reinthaler and James P. Smith III of counsel), and E. Allan Farnsworth for respondents in the second above-entitled action.
*336 Eliot Spitzer, Attorney General, New York City (Preeta D. Bansal, Edward Johnson, Thomas G. Conway, Jane M. Azia and Marion R. Buchbinder of counsel), amicus curiae in the first and second above-entitled actions.
*337 Rice & Justice, Albany (John Carter Rice, Lawrence P. Justice and Bradley F. Rice of counsel), for Business Council of New York State, Inc., amicus curiae.
Milbank, Tweed, Hadley & McCloy, L. L. P., New York City (Jeffrey Barist, David R. Gelfand, Charles Westland and Nicholas Smithberg of counsel), for American Council of Life Insurance, amicus curiae.
Chief Judge KAYE and Judges LEVINE, CIPARICK and WESLEY concur with Judge ROSENBLATT; Judge BELLACOSA dissents in part and votes to affirm in a separate opinion; Judge SMITH taking no part.

*338 OPINION OF THE COURT
ROSENBLATT, J.
In both appeals before us, plaintiffs are policyholders who have brought actions against insurance companies in connection with "vanishing premium" life insurance policies. They allege, in essence, that they purchased their insurance policies based on defendants' false representations that out-of-pocket premium payments would vanish within a stated period of time. Plaintiffs have asserted several theories of liability, two of which merit our review. One is based on plaintiffs' claims that defendants violated General Business Law § 349 by engaging in deceptive marketing and sales practices; the other is based on common-law fraud.

I.

Facts and Procedural History

A. The Gaidon-Guardian Action
In the mid-1980s, plaintiff representatives of a purported class each purchased a life insurance policy from defendant *339 Guardian Life Insurance Company of America.[1] Each policy was a "Whole Life Policy With Specified Premium Period." The policies contained provisions setting forth the periods for which premiums were to be paid. These periods varied from policy to policy and ranged from 10 years to life.
Plaintiffs allege that they bought their policies on the strength of false representations made to them by a Guardian sales agent. They assert that as part of the company's standard marketing presentation, the agent prepared a personalized "vanishing premium" illustration for each plaintiff. Using this device, the agent allegedly represented to each plaintiff that he or she would have to pay annual premiums out-of-pocket for only the first eight years of the policy, assuring each of them that the policy's dividends would thereafter cover the premium costs. Plaintiffs contend that the illustrations were premised on dividend projections that Guardian knew or should have known were untenable. Specifically, they allege that Guardian, in the mid-1980s, artificially inflated its current dividend rates despite waning profits because it wanted to continue depicting competitive vanishing dates.
On a separate page, accompanying each illustration, however, limitations such as the following appeared:
"Figures depending on dividends are neither estimated nor guaranteed, but are based on the [current year's] dividend scale."
"The [current year's] dividend scale reflects current company claims, expense, and investment experience * * * and taxes under current laws. Actual future dividends may be higher or lower than those illustrated depending on the company's actual future experience."
After deciding to purchase the policy each plaintiff signed an application. Several weeks later Guardian delivered the policies. Each policy contained the following provisions:
(1) "[a] participating policy shares in Guardian's divisible *340 surplus. The policy's share, if any, is determined yearly by Guardian"; and
(2) "[t]he dividend will reflect Guardian's mortality, expense, and investment experience."
Moreover, the policies contained several integration or merger clauses stating, in words or substance, that only the actual policy provisions controlled.[2]
In 1995, eight years after the sale of the policies, Guardian informed each plaintiff that his or her premiums would, in fact, not vanish and that if the policies were to remain in force, plaintiffs would have to continue out-of-pocket premium payments.[3] Plaintiffs brought this purported class action suit against Guardian in 1996.[4]
In its pre-answer motion, Guardian moved to dismiss. Supreme Court granted the motion and dismissed the complaint for reasons that varied with the particular plaintiff.[5] The Appellate Division affirmed but made no distinction among plaintiffs, holding that, among others, the fraudulent inducement and General Business Law § 349 claims failed as a matter of law (Gaidon v Guardian Life Ins. Co., 255 AD2d 101, 101-102).

B. The Goshen-MONY Action
Plaintiffs' assertions against defendants Mutual Life Insurance Company of New York and MONY Life Insurance *341 Company of America (collectively "MONY") mirror those in the Gaidon/Guardian case. In essence, they allege fraudulent representations and a deceptive marketing scheme, both based on untenable dividend projections.
Plaintiffs (members of certified class) purchased whole and universal life insurance policies in the mid-1980s from MONY. The MONY policies, like Guardian's, set forth premium payment schedules covering a stated number of years. MONY pre-sale illustrations were accompanied by "Limitations" pages similar to those in Guardian:
"This illustration shows the surrender of values dependent in whole or in part on dividends paid by the Company. These values are not guaranteed."
"Dividends shown and amounts dependent on them are based on the current illustrative formula. They are neither guarantees nor estimates of future results."
Each prospective policyholder submitted an application and, several weeks later, received a policy containing generally worded integration clauses.[6]
In 1995, MONY began informing plaintiffs that if they wished to keep their policies in force they would be required to pay additional premium payments beyond the depicted vanishing date. Employing theories similar to those in the companion case, plaintiffs commenced this action against MONY.[7]
Supreme Court certified the class to include
"all persons or entities * * * who have, or at the time of the policy's termination had, an ownership interest in one or more whole life or universal life insurance policies issued by [MONY] * * * and were harmed due to [MONY's] alleged wrongful conduct with respect to the sale of Policies on an alleged `vanishing premium' basis * * * during the period from January 1, 1982 through and including December 31, 1995."[8]
Following discovery, Supreme Court granted MONY summary judgment on all claims, including those for fraudulent *342 inducement and violation of General Business Law § 349. The Appellate Division, citing its decision in Gaidon (supra), affirmed, without opinion.

II.

Vanishing Premium Life Insurance: The Background
The cases before us are not unique. They involve allegations and practices of a national scope that have generated industry-wide litigation (see, 7 Holmes, Appleman on Insurance 2d § 49.19). In resolving this case, we consider the various types of cash value life insurance that are marketed, and the import of "vanishing premiums" in that setting.
All the policies in the appeals before us provide "whole life" or "universal life" insuranceeach a form of "cash value" life insurance. Cash value life insurance combines "pure" life insurance with an investment component that creates a potential accumulation of money in the policy (Downes and Goodman, Dictionary of Finance and Investment Terms, at 81 [4th ed]; see also, Black and Skipper, Life Insurance, at 177-78 [12th ed] [discussing "dual nature" of cash value life insurance]). In a cash value policy, the carrier typically invests accumulated money and pays returns to the policyholder in the form of dividends or interest (Downes and Goodman, op. cit., at 81).
When cash value insurance first emerged, insurance companies invested accumulated money exclusively in conservative securities with fixed interest rates, such as municipal and corporate bonds (see, Fischel and Stillman, The Law and Economics of Vanishing Premium Life Insurance, 22 Del J Corp L 1, 4 [1997]). Commentators point out that because interest rates "soared" in the late 1970s and early 1980s, the economics of these cash value life insurance policies became unattractive to investors who sought to take advantage of the high interest rates (see, Fischel and Stillman, op. cit., at 5; Multi-State Life Insurance Task Force and Multi-State Market Conduct Examination of The Prudential Insurance Company of America, Executive Summary, http://www.naic.org/nj/prusum.htm). In the mid-1980s, the life insurance industry reacted to its diminishing market share by designing policies, like the ones here at issue, in which policyholders' accumulated money is tied to the current rate of interest (see, Fischel and Stillman, op. cit., at 5).
Carriers marketed interest rate-sensitive insurance under a host of premium payment options, including the "vanishing *343 premium" plan (Fischel and Stillman, op. cit., at 6). Under this plan, the policyholder pays higher-than-normal premiums in the early years of the policy, resulting in a quicker accumulation of premium dollars for investment purposes (Fischel and Stillman, op. cit., at 6-7; Black and Skipper, op. cit., at 112). These policies are marketed on the premise that enough cash value will accumulate so that at a fixed date future administrative and insurance costs will be covered and the policyholder relieved of any further out-of-pocket premium obligations (Fischel and Stillman, op. cit., at 6-7).
In the late 1980s, however, sharply declining interest rates "upset the economics" of these widely marketed policies (Fischel and Stillman, op. cit., at 7). Accumulated cash values became insufficient to pay expected future insurance and administrative costs. By the early 1990s, many consumers who purchased such policies were required to continue out-of-pocket payments to keep their policies in force (Fischel and Stillman, op. cit., at 7). And the lawsuits followed.

III.

General Business Law § 349 As Compared With Common-Law Fraudulent Inducement

A. General Business Law § 349
In addressing the primary issues in these appeals, we must examine the components of both General Business Law § 349 and common-law fraudulent inducement. Although a person's actions may at once implicate both, General Business Law § 349 contemplates actionable conduct that does not necessarily rise to the level of fraud. In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer-protection concerns (see, Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 24-25). Although General Business Law § 349 claims have been aptly characterized as similar to fraud claims (e.g., Dornberger v Metropolitan Life Ins. Co., 961 F Supp 506, 549 [SD NY 1997]), they are critically different in ways illustrated by the cases at bar.
As this Court noted in Oswego (supra, 85 NY2d, at 24), General Business Law § 349 was enacted initially to give the Attorney General enforcement power to curtail deceptive acts and practiceswillful or otherwisedirected at the consuming public. Owing to the "ever-changing types of false and deceptive *344 business practices which plague consumers in our State," the Governor signed the measure into law (NY Dept of Law, Mem to Governor, Bill Jacket, L 1963, ch 813). In 1980, the Legislature took a significant step to expand the statute's enforcement scheme by allowing a private cause of action (General Business Law § 349 [h]).
As a threshold matter, in order to satisfy General Business Law § 349 plaintiffs' claims must be predicated on a deceptive act or practice that is "consumer oriented" (Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, 85 NY2d, at 24-25). We hold that they are. In contrast to a private contract dispute as to policy coverage (e.g., New York Univ. v Continental Ins. Co., 87 NY2d 308), the practices before us involved an extensive marketing scheme that had "a broader impact on consumers at large" (e.g., Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, at 25).
Turning to the other components of section 349, "a plaintiff must allege that the defendant has engaged `in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof'" (Small v Lorillard Tobacco Co., 94 NY2d 43, 55 [quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, at 25]). This Court has defined a "deceptive act or practice" as a representation or omission "`likely to mislead a reasonable consumer acting reasonably under the circumstances'" (Karlin v IVF Am., 93 NY2d 282, 294 [quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, at 26]). We hold that plaintiffs have adequately alleged that defendants violated the statute.
Plaintiffs have alleged, in essence, that defendants lured them into purchasing policies by using illustrations that created unrealistic expectations as to the prospects of premium disappearance upon a strategically chosen "vanishing date." This vanishing date, plaintiffs allege, was misleading, as based on the premise that interest rates would continue at a high, unprecedented rate for, in some cases, 20 or more yearsa premise that defendants allegedly knew to be unlikely.
Plaintiffs' argument is supported by the Attorney General, who has submitted an amicus brief asserting that the lower courts' interpretation of section 349 was too restrictive. He urges that a matter-of-law finding that the practices were not deceptive or misleading would undermine the State's power to *345 redress consumer practices that do not rise to the level of common-law fraud.
In seeking to uphold the dismissal of the section 349 claims, defendants argue, in substance, that the illustrated vanishing dates were not deceptive. They have directed our attention to the policies' merger clauses, which seek to confine their representations to the four corners of the policies. They also point to the above-quoted disclaimer language stating that illustrated dividend/interest rates "are neither guarantees nor estimates of future results" or that such rates may be "higher or lower * * * depending on the company's actual future experience." Defendants' contentions are compelling when resisting plaintiffs' claims of fraud, but they cannot, on this record, justify dismissal of plaintiffs' section 349 claims.
To begin with, the merger provisionsfor whatever other importance they may carryare not determinative of plaintiffs' section 349 claims, which are based on deceptive business practices, not on deceptive contracts. Moreover, the disclaimers, though more particularized than the merger provisions, do not speak to the true, unrevealed relationship between dividend/interest rates and the vanishing dates as represented. Consumers vary in their level of sophistication and their ability to perceive the connection between a fluctuation in dividend/interest rates and a vanishing date, or to make the necessary arithmetic adjustments. The issue before us is not whether, as a matter of law, reasonable consumers would be misled in a material way, but whether that prospect is enough to create a question of fact in the Goshen appeal, or to state a claim in Gaidon. It is, in both cases, for a number of reasons.
Defendants made vanishing dates the centerpiece of their sales presentations. They allegedly marketed vanishing premium policies by tying depicted vanishing dates to a milestone in the policyholder's near future (such as the policyholder's proposed retirement age or the year when a child was expected to go to college), and thereby created the expectation of a firm, personalized timetable. The very goal of the marketing scheme was to convince prospective purchasers that the vanishing date would in fact conform to the individualized projections. Plaintiffs allege that the defendants were aware that the premiums were unlikely to vanish as projected because they allegedly knew or should have known that the opposite was true: dividend/interest rates were not sustainable at the illustrated level. In the face of that unlikelihood, defendants created these expectations with illustrations based on the *346 unrealistic dividend/interest forecasts and without disclosure or disclaimer revealing that fact.[9]
Further, and in spite of this alleged knowledge, defendants allegedly trained sales agents to make presentations in ways that would arguably deceive and mislead prospective policyholders. The record contains a sales training videotape that is revealing. It instructs agents how to "cause the vanish to occur whenever your client wants to see it." Also, vanishing premium policies were marketed with slogans such as "Pay one and done," "4 Pay/No Pay," "Pay One Vanish," "Accelerated Vanish," and "How to get lifetime insurance protection with payments that are ... GOING, GOING, GONE."
The Gaidon action was determined solely on the pleadings. Plaintiffs have alleged that Guardian was aware of the unlikelihood that the then current dividend rate could be maintained. This awareness, plaintiff alleges, was based not only on the general state of the economy, but on Guardian's transactions and on its heightened knowledge of its own financial condition.
In Goshen, plaintiffs also have produced affidavits averring that the company's current dividend rate, as depicted at the time of the illustration, was based in part on non-recurring transactions that skewed any projection of MONY's ability to maintain the then current dividend/interest rates.
Insisting that they have engaged in no deceptive conduct, defendants have challenged plaintiffs' allegations. Defendant MONY, for example, asserts that "[t]he regulatory * * * repercussions of engaging in the sort of pervasive misconduct to which plaintiffs allude would be swift and severe." In this context we note that in 1997 and 1998 the New York State Superintendent of Insurance issued several regulations aimed directly at the marketing scheme before us. One regulation banned outright the use of "vanishing premium" language:
"When using an illustration in the sale of a life insurance policy, an insurer * * * shall not * * * use the term `vanish' or `vanishing premium,' or a similar *347 term that implies the policy becomes paid up, to describe a plan for using non-guaranteed elements to pay a portion of future premiums." (See, 11 NYCRR 53-3.2 [b] [8].)
Further, section 53-3.3 (a) (13) provides that where pre-sale illustrations depict reinvestment of non-guaranteed dividend/interest to pay off premiums,
"the illustration must clearly disclose that a charge continues to be required and that, depending on actual results, the premium payer may need to continue or resume premium outlays. Similar disclosure shall be made for premium outlay of lesser amounts or shorter durations than the contract premium. If a contract premium is due, the premium outlay display shall not be left blank or show zero unless accompanied by an asterisk or similar mark to draw attention to the fact that the policy is not paid up" (11 NYCRR 53-3.3 [a] [13] [emphasis added]).
Most pointedly, the Superintendent of Insurance has required carriers to dispel any false impression that dividend/interest rates would continue for all the years shown in a life insurance illustration. The regulation is designed to insure that prospective purchasers, during high interest eras, will no longer be led or misled to believe that their out-of-pocket obligations will be reduced or eliminated. Section 53-3.3 (b) (5) thus requires pre-sale illustrations to include the following statement:
"This illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. This is not likely to occur, and actual results may be more or less favorable than those shown" (11 NYCRR 53-3.3 [b] [5] [emphasis added]).[10]
*348 Contrary to the suggestions of our dissenting colleague, the actions of the Superintendent of Insurance are independent of our conclusion that plaintiffs have pleaded a valid section 349 claim.[11] They merely match and fortify our determination.
In all, we conclude that plaintiffs in the Gaidon action have adequately pleaded a General Business Law § 349 cause of action and that plaintiffs in Goshen have presented sworn assertions sufficient to raise a question of fact as to a General Business Law § 349 deceptive practice.

B. Common-Law Fraudulent Inducement
A practice may carry the capacity to mislead or deceive a reasonable person but not be fraudulent. That distinction separates plaintiffs' fraud claims from their section 349 claims. Fraud is wrongful enough to occupy a civil classification just short of criminal conduct. Over the years fraud has generally been defined by behavior involving intentional, false representations and other connotations of scienter such as willfulness, knowledge, design and bad faith (see, e.g, Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403, 407-408; Reno v Bull, 226 NY 546, 550).
To state a claim for fraudulent inducement in an insurance context, plaintiffs must allege a "misrepresentation or material omission" by defendants that induced plaintiffs to purchase the policies, as well as scienter, reliance and injury (New York Univ. v Continental Ins. Co., 87 NY2d 308, 318, supra; see also, Small v Lorillard Tobacco Co., 94 NY2d 43, 57, supra).
The parties' arguments for and against plaintiffs' fraud claims mirror those made in connection with section 349. Notably, plaintiffs stress that the illustrations were one-sided misrepresentations designed to deceive and mislead purchasers by projecting only the brighter prospects while concealing predictably bleaker ones. They assert that they have met the "misrepresentation or material omission" threshold for fraud, *349 alleging that the illustrations painted a purposefully distorted landscape using false, untenable interest rate projections and further, that defendants intentionally diverted funds to conceal the artificially inflated nature of the dividend picture.
Defendants argue that plaintiffs' assertion that they intentionally and artificially inflated dividends is largely conclusory and incompatible with the constraints of a highly regulated industry. Contending further that there was no misrepresentation or falsification that could give rise to a fraud claim, defendants submit that the dividend/interest rates projected in the illustration tables were, in fact, those being paid out to policyholders at the time of the sales presentations. Additionally, defendants claim that the projections were illustrations only, that they were based on the continuation of an existing state of affairs and cannot be construed or characterized as guarantees. They also argue, in substance, that any claim of fraudulent concealment or omission is necessarily defeated by the disclaimer language in the illustrations.
We recognize that a number of courts have gone so far as to sustain fraud charges as adequately pleaded in vanishing premium cases (see, e.g., Greenberg v Life Ins. Co., 177 F3d 507 [6th Cir 1999]; Myers v Guardian Life Ins. Co., 5 F Supp 2d 423 [ND Miss 1998]; Nepomoceno v Knights of Columbus, 1999 WL 66570, 1999 US Dist LEXIS 1366 [US Dist Ct, ND Ill, Feb. 8, 1999, Civ A 96 C 4789], supra; Grove v Principal Mut. Life Ins. Co., 14 F Supp 2d 1101 [SD Iowa 1998]; Force v ITT Hartford Life & Annuity Ins. Co., 4 F Supp 2d 843 [D Minn 1998], supra; Chain v General Am. Life Ins. Co., 1996 WL 671394, 1996 US Dist LEXIS 21505 [US Dist Ct, ND Miss, Sept. 30, 1996, No. 4:96CV96-B-B]; In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F Supp 584 [D NJ 1996]; Mentis v Delaware Am. Life Ins. Co., 1997 WL 744430, 1999 Del Super LEXIS 419 [Del Super Ct, July 28, 1999, CA No. 98C-12-023 WTQ]; but see, Frith v Guardian Life Ins. Co., 9 F Supp 2d 744 [SD Tex 1998]; Solomon v Guardian Life Ins. Co., 1996 WL 741888, 1996 US Dist LEXIS 18342 [US Dist Ct, ED Pa, Dec. 11, 1996, Civ A 96-1597], affd 162 F3d 1152 [3d Cir 1998] [unpublished table decision]).
We conclude, however, that defendants' disclaimers, although insufficient to defeat plaintiffs' section 349 claims, are sufficient to absolve them of fraud. Defendants are correct in asserting that plaintiffs have not met the threshold element to support a fraud claim"misrepresentation or material omission." The elements of fraud are narrowly defined, requiring *350 proof by clear and convincing evidence (cf., Vermeer Owners v Guterman, 78 NY2d 1114, 1116). Not every misrepresentation or omission rises to the level of fraud.[12] An omission or misrepresentation may be so trifling as to be legally inconsequential or so egregious as to be fraudulent, or even criminal. Or it may fall somewhere in between, as it does here.
By stating that the illustrated dividend/interest rates are not guaranteed and that they may be higher or lower than depicted, defendants made a partial disclosure. They revealed the possibility of a dividend/interest rate decline, but did not reveal its practical implications to the policyholder. Although they did not guarantee that interest rates would remain constant, they failed to reveal that the illustrated vanishing dates were wholly unrealistic.
We conclude that although defendants' sales practice, as pleaded, falls within the purview of General Business Law § 349, it does not constitute a "misrepresentation or material omission" necessary to sustain a cause of action for fraud.
Because the Appellate Division dismissed the entire Gaidon/Guardian complaint on the merits, it is now necessary for that Court to consider which plaintiffs would be legally entitled to bring a claim under General Business Law § 349. Accordingly, in Gaidon, the order of the Appellate Division should be modified, without costs, by reinstating the General Business Law § 349 cause of action, and remitting the case to that Court for consideration of issues raised but not determined on the appeal to that Court. As so modified, the order should be affirmed.
In Goshen, the order of the Appellate Division should be modified, without costs, by reinstating the General Business Law § 349 cause of action and remitting the case to Supreme Court for further proceedings consistent with this opinion and, as so modified, affirmed.
BELLACOSA, J. (dissenting in part). My dissent is respectfully tendered solely with regard to the revival and reinstatement of the General Business Law § 349 claims. I agree with the lower courts, including their rulings that these particular claims are no more sustainable or cognizable on these records than any of the other standard claims.
I dissent also because the precedential implications of the *351 Majority holding, as proposed, are beyond the intent, enactment and interpretation of this remedial statute. In particular, I conclude that no deceptive act or practice, which would mislead a reasonable consumer, has been alleged in these cases under this statute. I would therefore affirm the Appellate Division orders outright.

I.
In the Gaidon action, defendant's motion to dismiss pursuant to CPLR 3211 was granted, dismissing plaintiffs' complaint containing their causes of action for violations of General Business Law § 349. The standard applied in this case is whether a pleading and its factual allegations manifest any cause of action "cognizable at law" (Guggenheimer v Ginzburg, 43 NY2d 268, 275). Dismissal is appropriate when evidentiary material is considered where an alleged material fact "is not a fact at all and * * * no significant dispute exists regarding it" (id., at 275).
Here, the complaint must sufficiently set forth a "forbidden type of deception" (id., at 275). While the failure to disclose information may be found "less than candid, it cannot, as a matter of law, be found deceitful" when there is no evidence in the record to refute defendant's assertions (see, St. Patrick's Home for Aged & Infirm v Laticrete Intl., 264 AD2d 652, 655). The failure of a pleading to present a deceptive act or practice, under the sweep and provenance of General Business Law § 349, should render the asserted claims deficient on the face of, and at the outset of, the dispute brought to a court (see, id.).
Defendants moved in the Goshen action for summary judgment. Thus, reviewing the pleadings as well as the evidentiary materials, plaintiffs must present a triable issue of fact to defeat the motion. I conclude, as did the courts below, that no genuine triable issue of fact is presented on this record, and summary judgment was appropriately granted to defendants.
In the instant cases, plaintiffs essentially charge that the use of illustrations by defendants' sales agents, depicting time lines at which premium payments might "vanish," misled the consumers within the meaning of the statute. Additionally, in Goshen, plaintiffs claim that defendant MONY knew the use of the "vanishing premium" sales promotion was not viable and that the company attempted to conceal this awareness from the plaintiff class. The Goshen plaintiffs submitted affidavits purporting that the dividends illustrated by MONY were not *352 sustainable. In my view, on these records, the allegations do not measure up to cognizable causes of action necessitating a trial on the General Business Law § 349 claims.

II.
In 1970, the Legislature enacted section 349 of the General Business Law to "strengthen the consumer protection powers of the Attorney General by enabling him to obtain injunctions against all deceptive and fraudulent practices affecting consumers and by clarifying his powers to obtain restitution for defrauded consumers in such proceedings" (Governor's Mem approving L 1970, chs 43 and 44, 1970 NY Legis Ann, at 472). Consumers were given a protection for an "honest market place" enforceable by the Attorney General (id., at 472). Section 349 tracked the actions of the FTC with respect to interpretation and enforcement of the Federal Trade Commission Act (15 USC § 45), in that agency's effort to eradicate or penalize deceptive acts and practices (see generally, Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power, 76 Misc 2d 50, 54).
In 1980, the New York Legislature enhanced this State's protective mechanism. It gave a private right of action to allegedly wronged consumers to pursue consumer fraud claims personally (General Business Law § 349 [h]). This powerful tool was to "supplement the activities of the Attorney General in the prosecution of consumer fraud complaints" (Governor's Mem approving L 1980, ch 346, 1980 NY Legis Ann, at 147). Moreover, the enactment of this statutory remedy was not to deprive plaintiffs of any common-law remedies (see generally, Schuster v City of New York, 5 NY2d 75, 85 [statutory remedy is "merely cumulative"]).
I am not persuaded that support exists to justify a further enhancement of General Business Law § 349 to make it a "catch-all" remedy. It should not be construed as providing all-encompassing redress. To interpose such a procedural and remedial disincentive against aggrieved persons pursuing longstanding traditional remedies at common law, as well as other statutory and regulatory measures affecting a gigantic industry like insuranceand precedentially all othersis a remarkable step and development that I do not believe is warranted or intended.

III.
Section 349, unlike other States' deceptive practice statutes, does not supply a definition of "deceptive acts or practices." *353 Noting the undeniable remedial nature of section 349, this Court proportionately recognized the potential for overbreadth inherent in the interpretation and application of the statute. Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank (85 NY2d 20) announced the test which should determine whether defendants here violated section 349. The standard is whether "defendant is engaging in an act or practice that is deceptive or misleading in a material way" and whether "plaintiff has been injured by reason thereof" (id., at 25). While I agree with the Majority's acknowledgment of the appropriate test, my application of it results in an affirmance and resolution against the groundbreaking availability of New York's General Business Law § 349. Based on the Majority's holding, a wide expansion of the theory underlying this statutory remedy will henceforth be operative.
Yet, to avoid the possibility of "excessive litigation" (class or individual) under General Business Law § 349, this Court evoked "`an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances'" (Karlin v IVF Am., 93 NY2d 282, 294, quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, 85 NY2d, at 26; contrast, Note, New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor, 48 Brook L Rev 509, 548).
The judicial framework and resolution can be determined as a matter of law or fact (Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, 85 NY2d, at 26). Particularly in omissions cases, the statute does not require businesses to "guarantee that each consumer has all relevant information specific to its situation. The scenario is quite different, however, where the business alone possesses material information that is relevant to the consumer and fails to provide this information" (id., at 26).
The capacity and potential of the material to qualify as a misleading act that deceives must be assessed in individual cases and circumstances. The determination of the deceptiveness of the conduct that bears on the reasonableness of the consumer should not be bifurcated between the sales materials and the contract policies themselves, as the Majority's analysis does. That is a commercially unrealistic segmentation that artificially skews the statutory reach.
Deception requires a misrepresentation of fact under the whole set of dealings of the parties (see generally, State of New *354 York v Unique Ideas, 85 Misc 2d 258, affd in part, mod as to damages 56 AD2d 295, mod as to damages 44 NY2d 345). The language of the policies, which included statements that premiums are regularly due, cannot be so facilely cast aside in determining whether a misrepresentation of fact was alleged which would mislead a reasonable consumer, acting reasonably, into buying that policy. The reasonableness of the consumer viewpoint in my judgment of the statute, ought to be evaluated in light of all the facts before the consumersthe sales promotion, the written illustrations expressing no guarantees, and the policies excluding extraneous facets from the sales transaction and agreement. In other words, the integrated transaction determines the availability of the statute, not just the initial contact, sales pitch or some predicate facet.

IV.
Thus, application of Oswego's standards to plaintiffs' General Business Law § 349 claims demonstrates, as a matter of cogent, even compelling, record dealings, that plaintiffs fail to propound cognizable claims or a triable issue of fact under the statute. The complaints, and the accompanying submissions in Goshen, simply do not allege a sustainable basis or theory that plaintiffs were materially deceived and harmed by defendants' actionsthat is, by the entire array of interrelated steps leading to the purchase of the policies.
In Gaidon, the asserted deceptive act is that defendant Guardian, through its sales presentations and policy illustrations, misrepresented that payment of premiums only during the first several years of the policy would suffice to carry out the cost of the policy for the life of the insured. Plaintiffs allege that this illustrative sales promotion induced purchase of the policies and falls within the limitless statute. Yet, the express terms of the policy plainly indicate the duration of the required premium payments; and the written policy illustrations used by defendant Guardian specifically stated they were neither part of the actual insurance policy, nor that the dividends were guaranteed.
Moreover, to the extent that plaintiffs in Gaidon argue that they pleaded a cognizable section 349 claim based on defendant Guardian's use of misleading dividend scales in its illustrations, plaintiffs' argument is baseless. The illustrations accord with applicable official regulations which require that "[i]f dividends are illustrated, they must be based on the *355 insurer's current dividend scale and the illustration must contain a statement to the effect that they are not to be construed as guarantees or estimates of dividends to be paid in the future" (11 NYCRR 219.4 [n]). The Majority's conclusionthat the use of standard, officially approved and authorized illustrations amounts to a deceptive practice under General Business Law § 349is a breakaway proposition with troubling precedential implications and a fundamental unfairness by changing the rules of trade after the fact.
Similarly, in Goshen, the certified class members sought to recover under General Business Law § 349 based on their understanding of written policy illustrations that premium payments would only have to be paid for a limited number of years. Defendant MONY utilized different versions of the written illustrations. All illustrations, however, included statements that they were not valid without a "Limitations and Definitions" form, which, at minimum, cautioned any potential purchaser that only the policy itself with the application is the entire contract. The policies then repeated the same admonition that they alone constituted the entire agreement of the parties. To wholly sideline these pervasively employed integration clauses in these circumstances is a discretely portentous precedential development. That alone justifies my dissenting expression as fair notice to the Bench and Bar, and as an incentive for legislative consideration of some reasonable limitations on the sweep of the law.
As an additional argument, the plaintiff class in Goshen urges that MONY executives knew that the "vanishing premium" concept was not viable, given inevitably uncertain predictions about future economic conditions. But that unpredictability is a known constant to the world at large, not just to insurance executives.
Oswego Laborers' Local 214 Pension Fund (supra, at 26) further teaches another axiom: MONY was not required to "guarantee that each consumer has all relevant information specific to its situation." The sales nomenclature of "vanishing premium" does not even denote a type of life insurance policy (see, Fischel and Stillman, The Law and Economics of Vanishing Premium Life Insurance, 22 Del J Corp L 1, 7). Rather, the "vanishing premium" notion is a marketing technique and advertising device based on a proposed financing spread sheet which provides "a vanishing-premium option or rider to the basic life insurance policy" (Fischel and Stillman, op. cit., at 7, n 28). The illustrations "are based on projections of certain *356 outside economic factors which may or may not come true" (Fischel and Stillman, op. cit., at 7, n 28 [emphasis added]). Consumers know as a matter of common sense and knowledge, or ought to be reasonably charged with knowing that truism. Besides, they were informed of this very point in writing twice at least. The illustration materials themselves and the actual policies so declare. They are unassailable documentary proofs, not wispy disappointment claims that the deals did not turn out as hoped for or expected.
The point at which the premium payment obligation "vanishes," as advertised through the illustrations, does not imply, moreover, that the policyholder will never again have an obligation to pay premiums. Rather, the illustrations project that the policy may be "self-perpetuating," at a point when future premium payments should be paid up using the generated policy dividends (Fischel and Stillman, op. cit., at 7, n 28). Reasonable consumers should not be allowed to inferby operation of law through interpretive judicial rulings, statutes and regulationsthat external economic factors would remain static and that the cessation of cash premium payments would be a certainty, for lack of which statutory liability is primed. That consequence defies history and fair dealing on a common sense landscape.
Plaintiffs' allegations that they were deceived into believing that the premium payments would inevitably cease at a fixed point in time is, moreover, contradicted by all the available documentation. Courts should not ignore the explicit language of the insurance contracts and the reasonable understanding and expectation concerning the ineffability of extrinsic economic and market forces. Everyone should be charged with the plain fact that only the unknowable future could ultimately shape and control these matters.
Next, the use of interest rate assumptions in the policy illustrations should not be deemed realistically to have the capacity to mislead prospective policyholders. That is a too far-out legal fiction. The probable level of future interest rates is, again, most certainly and most commonly known and appreciated as something not solely within an insurance company's or anyone else's ability to forecast (see, Fischel and Stillman, op. cit., at 14). Even Alan Greenspan and the Federal Reserve Board hedge their "bets" and just do their best. Furthermore, any general information defendants had involving market projections was the type of information plaintiffs, indeed anyone, "could reasonably have obtained" (Oswego Laborers' *357 Local 214 Pension Fund v Marine Midland Bank, supra, 85 NY2d, at 27), on their own, through financial advisors or via the "Internet".
Plaintiffs argueand the Majority adoptsthe proposition that defendants created a misleading impression of these policies by not revealing their potential downsides. This aspect, as that syllogism sets the stage for the future, helps to drive the General Business Law § 349 claims in these cases. My simple answer is that the entire insurance industry, by its nature, insures many things. But to derive an insurance obligation out of this new "pros and cons" balancing technique is a far-reaching concept and legal responsibility, bound to confound any rate or risk underwriter. Risk projections and re-allocation on this basis constitute a major shift for any type of sales-oriented business. By court decree instead of market forces they must, when emphasizing the positive aspects of their policies or products, also provide minimizing features and negatives (contrast, Fischel and Stillman, op. cit., at 15).
To hold, even in part, that giving a product its best sales "face," even with some "puffery" and artfully spun advertising, is actionable under General Business Law § 349 pushes this consumer protection statute into uncharted and unintended territories. "Puffing" defensesa seller's claim that no reasonable person would believe some sales promotion to be literally trueshould have some reasonable place in the General Business Law § 349 universe as to who bears the risk of the bargain (see generally, Pitofsky, Beyond Nader: Consumer Protection and the Regulation of Advertising, 90 Harv L Rev 661, 677). If not, this statute launches limitless liability.
Reasonable consumers acting reasonably recognize sales pitches and ordinarily discount them accordingly. In addition, to acknowledge that consumers understand that future interest rates will affect their future premium rates is reasonable and even respectful of individual intelligence, personal accountability and good common sense (see, Fischel and Stillman, op. cit., at 16).
Based on the records of these cases, I agree with the lower courts that plaintiffs failed to show that defendants engaged in materially misleading or deceptive acts or practices. The alleged representations made by defendants were not "likely to mislead a reasonable consumer acting reasonably" (Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, supra, at 26). Prospective market forces predominantly control *358 here, and a remedial rescue by statute or judicial gloss on a statuteafter the economic facts inexorably unfold under their own powerought not become the benevolent standard for shifting fault, reallocating risk and relieving individuals of some measure of reasonable responsibility and private accountability.
In sum, I would wholly affirm the orders of the Appellate Division in the actions entitled under Gaidon and Goshen. While I agree with the Majority rationale and result on plaintiffs' common-law fraud claims, I respectfully dissent for the reasons given and conclude that plaintiffs have not propounded cognizable or triable General Business Law § 349 claims.
In Gaidon v Guardian Life Ins. Co.: Order modified, etc.
In Goshen v Mutual Life Ins. Co.: Order modified, etc.
NOTES
[1] Named plaintiffs are Frank Gaidon, Frank DeHamer, Nicholas DeHamer and Kathleen Warner, along with Allen Glass and Barbara Gaidon, as trustees of two different trust funds that at different times owned the life insurance policy on Frank Gaidon's life. Frank Gaidon, himself, never owned the policy.

Guardian moved to dismiss in a pre-answer motion, made before plaintiffs sought class certification.
[2] These clauses typically stated that "[t]he actual provisions set forth the full details and conditions of this policy; only the actual provisions will control."
[3] Guardian allegedly informed Frank Gaidon that he would be required to pay premiums for the rest of his life.
[4] The complaint included causes of action for fraud, fraudulent inducement, breach of fiduciary duty, breach of contract, negligence, negligent misrepresentation, unjust enrichment and imposition of a constructive trust, declaratory and injunctive relief, reformation, violation of General Business Law § 349 and violation of Insurance Law §§ 2123 and 4226.
[5] Supreme Court held that, with the exception of the Gaidon trustees, all plaintiffs lacked standing to assert any claims against Guardian. Specifically, the court determined Frank Gaidon lacked standing because his policy was owned by trusts and not Gaidon himself. The court further ruled that Frank and Nicholas DeHamer and Kathleen Warner lacked standing because they signed releases as part of forms Guardian required them to sign to cancel their policies. Supreme Court then dismissed the Gaidon trustees' fraudulent inducement claims and General Business Law § 349 claims, holding that Guardian did not make the alleged misleading or fraudulent representations directly to the trustees; rather, that its sales agents interacted only with and made representations to Frank Gaidon himself.
[6] MONY policies provide that "[t]he policy with the application is the entire contract."
[7] Plaintiffs asserted causes of action for fraudulent concealment and deceit, negligent misrepresentation, reckless, wanton and/or negligent supervision, breach of contract, breach of fiduciary duty, fraudulent inducement, violations of Insurance Law §§ 4226 and 2123 and violations of General Business Law § 349.
[8] The propriety of the class certification is not before us on this appeal.
[9] We are not persuaded by the assertion in the dissent that defendants are, as a matter of law, relieved of General Business Law § 349 liability for having based their illustrations on the then "current dividend scale" (see, dissenting opn, at 355 [discussing 11 NYCRR 219.4 (n)]). Section 219.4 (n) was promulgated to preclude insurance companies from depicting speculative interest rates above those currently paid by the carrier. It certainly does not mandate that a carrier project a premium payment plan that it allegedly knows to be unsustainable, while revealing nothing as to the improbability of the projection.
[10] We note also that 25 States have adopted measures similar to these regulations expressly aimed at combating alleged deception caused by "vanishing premium" illustrations (see, e.g., Cal Ins Code § 10509.955; 40 Penn Stat Annot § 625-8; RI Gen Laws § 27-62-5; Ala Ins Departmental Reg No. 114, § 6; 3 Alaska Admin Code 28.815; 3 Colo Code Regs § 4-1-8 [VI]; Conn Agencies Regs § 38a-819-61; Del Ins Reg No. 62; 50 Ill Admin Code 1406.70; 191 Iowa Admin Code 14.6, 15.3 [507B]; Me Bureau of Ins Rule Ch 910, § 6; Miss Ins Reg No. 98-2; 210 Neb Admin Code § 72-006; Nev Admin Code 686A.4785; NJ Admin Code §§ 11:4-41.211:4-41.4; 11 NC Admin Code 4.0504; ND Admin Code § 45-04-01.1-04; Ohio Admin Code Ann XXXX-X-XX; Okla Admin Code 365:10-3-54; Oregon Admin Rules XXX-XXX-XXXX; SC Code of Regs 69-40; Admin Rules of SD 20:06:38:05; 28 Texas Admin Code § 21.2206; Utah Admin Code R590-177-6; Code of Vermont Rules XX-XXX-XXX, § 6; Wisc Admin Code § Ins 2.17).
[11] We further note that courts in other jurisdictions have sustained deceptive trade practice causes of action under statutes similar to New York's (see, e.g., Nepomoceno v Knights of Columbus, 1999 WL 66570, 1999 US Dist LEXIS 1366 [US Dist Ct, ND Ill, Feb. 8, 1999, Civ A 96 C 4789]; Force v ITT Hartford Life & Annuity Ins. Co., 4 F Supp 2d 843 [D Minn 1998]; Parkhill v Minnesota Mut. Life Ins. Co., 995 F Supp 983 [D Minn 1998]).
[12] See generally, 2 Harper and James, Torts § 7.14 (2d ed 1986); Prosser and Keeton, Torts § 106 (5th ed 1984).