This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 47
Michael J. Carlson, Sr., &c.,
            Appellant,
        v.
American International Group,
Inc., et al.,
            Respondents.


            Edward J. Markarian, for appellant.
            Kevin D. Szczepanski, for respondents American
International Group, Inc., et al.
            Paul Kovner, for respondent American Alternative
Insurance Co.
            Patrick J. Lawless, for respondent DHL Express (USA),
Inc.
            New York State Trial Lawyers Association; American
Insurance Association et al.; New York State Academy of Trial
Lawyers, amici curiae.


WILSON, J.:

            Plaintiff Michael Carlson, individually and in his

capacity as Administrator of his deceased wife's estate and as

assignee of William Porter, commenced this action pursuant to

Insurance Law § 3420 (a) (2) to collect on certain insurance

policies issued to DHL Worldwide Express, Inc. (DHL) by National

- 1 -

Union Fire Insurance Co. (National Union) and American Alternative Insurance Co. (AAIC).  Mr. Carlson previously had obtained a judgment against MVP Delivery and Logistics, Inc. (MVP) and William Porter (see Carlson v Porter, 53 AD3d 1129 [4th Dept 2008], lv denied 11 NY3d 708 [2008]).  On appeal, we consider whether Mr. Carlson has sufficiently pleaded that MVP is an "insured" under DHL's policies, and whether the policies fall within the purview of Insurance Law § 3420 as policies "issued or delivered" in New York.  We hold that dismissal of the first cause of action pursuant to Insurance Law § 3420 (a) (2) and (b) was improper as to National Union and AAIC.  Whether MVP was an "insured" under DHL's policies presents a question of fact to be resolved by the trier of fact.  Additionally, the meaning of "issued or delivered" is informed by our decision in Preserver Ins. Co. v Ryba (10 NY3d 365 [2008]), and thus, section 3420 encompasses situations where both insureds and risks are located in this state.

I.

Claudia Carlson was killed when a truck painted with DHL's logo, owned by MVP and driven by William Porter, an employee of MVP, crossed the double-yellow divider and hit her car head-on.  Prior to the accident, Mr. Porter had driven the truck home on a scheduled break, when he learned that his son had been in an accident.  Mr. Porter drove the truck to the accident site, and while driving the truck to retrieve a tool to repair

his son's vehicle, Mr. Porter veered into Mrs. Carlson's car, killing her. A jury awarded her husband, individually and as administrator of her estate, $20 million against MVP, Mr. Porter and DHL. The Appellate Division set aside the verdict against DHL and dismissed the complaint against it, concluding that DHL was not vicariously liable under the doctrine of respondeat superior. The court also found damages to be excessive, and Mr. Carlson stipulated to a reduced judgment of $7.3 million. MVP's insurer paid Mr. Carlson approximately $1.1 million, and Mr. Porter assigned to Mr. Carlson whatever rights Mr. Porter had to any other insurance coverage.

At the time of the accident, DHL and MVP were parties to a cartage agreement, pursuant to which MVP used its fleet of trucks and employees to perform DHL's package delivery services in Western New York. DHL had three insurance policies relevant here: (1) a $3 million primary policy issued by National Union, which included "hired auto" coverage insuring DHL, its employees, and "[a]nyone else while using with your permission a covered 'auto' you own, hire, or borrow"; (2) a $2 million excess insurance policy with AAIC, with the exact same coverage as the National Union policy; and (3) a $23 million umbrella policy with National Union, which covered vehicles "hired by [DHL] or on [DHL's] behalf and used with [DHL's] permission." American International Group, Inc. and AIG Domestic Claims, Inc. (collectively, AIG) did not issue any relevant policy to DHL.

Mr. Carlson commenced this action against National Union, AAIC, AIG, and DHL, alleging five causes of action. The first asserted a claim under Insurance Law § 3420 (a) (2) and (b), against National Union, AAIC and AIG, to satisfy the outstanding judgment. The second, third, and fourth causes of action asserted damages against National Union, AAIC and AIG for misrepresentations, bad faith refusal to settle, and violations of General Business Law § 349, respectively. The fifth cause of action sought damages against DHL and AIG for conspiracy.

Defendants moved to dismiss the complaint in its entirety. As to the first cause of action, AAIC moved to dismiss on the ground that section 3420 did not permit a claim against it because its policy, initially issued by it to DHL's predecessor, Airborne Inc. (headquartered in Washington), and later assumed by DHL (headquartered in Florida), was not "issued or delivered" in New York. Supreme Court denied that motion, and allowed discovery to proceed on the issue of coverage. After limited discovery had occurred, Supreme Court granted the motions and cross motion to the extent of dismissing causes of action 2, 3 and 5 of the complaint, but refused to dismiss the first and fourth causes of action.

The Appellate Division dismissed Mr. Carlson's General Business Law § 349 claim as to all remaining defendants (see Carlson v Am. Int'l Grp., Inc., 130 AD3d 1479, 1482 [4th Dept 2015]). The Appellate Division also dismissed the first cause of

action.  As to AIG, the Appellate Division concluded that because the two AIG entities established that they are not insurers, no section 3420 claim lay against them (see id. at 1480).  The Appellate Division held that Mr. Carlson could not state a claim against National Union because (a) the MVP vehicle was not a "hired automobile" and (b) DHL could not grant MVP permission to use it (see id. at 1481).  In a companion appeal, the Appellate Division determined that the AAIC policy was not issued or delivered in New York and dismissed the first cause of action against AAIC (see Carlson v Am. Int'l Grp., Inc., 130 AD3d 1477, 1477-1478 [4th Dept 2015] [concluding that the parties and Supreme Court had "improperly conflated the phrase 'issued or delivered' with 'issued for delivery'"]).

## II.

On a motion to dismiss for failure to state a cause of action, the complaint must be liberally construed, and courts must provide a plaintiff with every favorable inference (see 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002]; Leon v Martinez, 84 NY2d 83, 87 [1994]; CPLR 3026; see also Held v Kaufman, 91 NY2d 425, 432 [1998] ["every favorable inference must be afforded the facts alleged in the complaint and in the various motion papers submitted by (the plaintiff)"]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC

I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).

"Under CPLR 3211 (a) (1), a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law. In assessing a motion under CPLR 3211 (a) (7), however, a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint and the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one" (Leon v Martinez, 84 NY2d 83, 88 [1994] [internal quotation marks and citations omitted]).  Here, Mr. Carlson submitted an expert affidavit providing support for the propositions that, under industry custom and practice, MVP's trucks were hired autos used with DHL's permission.  Defendants offered no contrary expert opinion, and challenged the expert's opinions neither here nor below.  Although they remain free to do so at a later stage of the proceedings, at this stage the expert's opinions concerning insurance industry custom and practice as to the comprehensive coverage of hired fleets, even when trucks within a fleet are at times not used for business purposes, are sufficient to defeat a motion to dismiss.

A.

As to the hired auto issue, dismissal on that ground was erroneous, for two additional reasons.  First, defendants and the Appellate Division rely on the contract of insurance, without reference to extrinsic evidence, to conclude that the truck

driven by Mr. Porter was not a hired auto, thus entitling them to

dismissal.  However, as Mr. Carlson argues, and defendants admit,

a portion of the insurance contract, the Schedule of Hire, has

not been produced.  According to the expert, the Schedule of Hire

would show that DHL's insurance policies cover all of MVP's

vehicles.  Mr. Carlson also points to evidence concerning the

underwriting of the policies, which demonstrates that DHL's

policies were priced to cover MVP's trucks as hired autos.[1]  If

the Schedule of Hire exists, its production is essential to

determination of the full content of the contract; it would be

error to dismiss the coverage claim based on only part of a

contract, particularly where a highly germane portion is

missing.[2]  If the Schedule of Hire has been lost or destroyed, it

would likewise be error to dismiss the coverage claim, because

Mr. Carlson would be entitled to attempt to prove the missing

portion by parol evidence (see Belknap v Witter & Co., 92 AD2d

515, 517 [1st Dept 1983] ["an incomplete contract falls within

---

[1] For example, he asserts that DHL purchased additional coverage for independent contractor vehicles under the hired auto provisions of its business automobile policies and that National Union contemplated the exposure of the so-called independent contractors driving their own vehicles in hauling goods on behalf of DHL in the pricing of the insurance policy and calculated the premiums to cover the MVP vehicles as hired automobiles. Notably, DHL's coverage for the hired automobiles was for amounts in excess of $1 million, where DHL required MVP to carry $1 million coverage.

[2] Because the Schedule of Hire is missing, the dissent's contention that the agreement is "complete and clear and unambiguous upon its face" is puzzling.

one of the limited exceptions to the parol evidence rule"], affd 61 NY2d 802 [1984]) or, perhaps, would be entitled to an adverse inference based on defendants' duty to maintain the Schedule (see Pegasus Aviation I, Inc. v Varig Logistica S.A., 26 NY3d 543, 551 [2015]; CPLR 3126).

Defendants' argument that the Schedule of Hire would have been unlikely to list MVP's vehicles individually, and therefore defendants should prevail as a matter of law, is in any event foreclosed by our decision in Jefferson Ins. Co. of New York v Travelers Indemnity Co. (92 NY2d 363, 370 [1998]), in which we held: "that the van is not specifically listed [in the Schedule of Hired and Non-Owned Coverage] is not determinative" of coverage, because the policy "listed 'N.Y.' as the State in which such coverage would apply, and also listed a 'Rate per each $100 cost of hire' and a premium amount."

Second, the insurance policies do not define "hired auto," and neither the Appellate Division nor defendants point to any industry-standard definition. Defendants argue, and we agree, that the degree of control exercised by DHL over MVP's trucks is pivotal to the determination of whether they are hired autos. However, the issue of control is fact-specific. The cartage agreement contains some terms militating against a finding of control; for example, Section 3.3 of the cartage agreement gives MVP control over the manner of performance, including the number of vehicles and routing of the vehicles, and

Section 3.5.2 makes MVP responsible for the maintenance of the vehicles.  The cartage agreement also contains terms that militate in favor of finding that DHL exercised substantial control over MVP's trucks.  For example, DHL required all MVP trucks used for DHL's business to have DHL's paint scheme and identifying marks; DHL imposed maintenance requirements for the vehicles, and required that any necessary repairs to the vehicles be made and documented in accordance with procedures established by DHL; DHL specified the types of vehicles to be used for different types of deliveries; and DHL required MVP to use DHL's routing software.  MVP was prohibited from making deliveries for a DHL competitor; even if MVP wanted to use its trucks to make a delivery for a non-competitor, it had to obtain DHL's permission and remove DHL's marks from the truck; and MVP could not retain any third parties to perform its work without DHL's prior written authorization.  Those substantial restrictions on MVP's ownership and ability to use its trucks go well beyond simply controlling DHL's intellectual property and brand.

Most significantly for the purpose of this appeal, determining the extent of control is not limited to the face of the contract, but concerns the actual degree of control exercised by DHL over MVP.  Mr. Carlson, who obtained some limited discovery, has pointed to evidence supporting the proposition that DHL actually exercised substantial control over MVP's

trucks.[3]  For example, MVP's entire fleet was used exclusively for DHL deliveries; DHL prescribed the make and model of the vehicles to be used by MVP; MVP's vehicles were garaged in DHL's facility; DHL had keys to MVP's offices, which were located inside the DHL facility; DHL dispatched MVP drivers and owned the equipment used to do so; DHL sent MVP drivers instructions via text message; DHL provided routing specifications for express shipments and required MVP to follow them; DHL required MVP to collect money on COD (collect on delivery) shipments and remit those monies to DHL; and if a customer had a problem, MVP was required to contact DHL or tell the customer to do so.  All MVP employees were required to wear DHL uniforms, DHL audited MVP's safe driving practices, and DHL regularly examined MVP's routes and adjusted them.

Contrary to the Appellate Division's holding, the fact that the cartage agreement labels MVP an "independent contractor" is not dispositive of the issue of control, but is a factor to be weighed with others.  In Matter of Rivera (State Line Delivery Serv.-Roberts) (69 NY2d 679, 682 [1986]), we noted that "whether the relationships of the operators-deliverers with the delivery

_____

[3] Mr. Carlson pleaded as much: "[A]t the time of the accident, MVP was delivering goods and hauling freight for DHL pursuant to a Cartage Agreement that was drafted by DHL, and contained a very detailed set of directives through which DHL created a relationship wherein MVP's discretion was all but completely eliminated, and DHL retained virtually complete control with respect to the means and manner by which MVP's services were to be delivered."

companies is that of employees or independent contractors involves a question of fact as to whether there is evidence of either control over the results produced or over the means used to achieve the results."  In various other contexts, we and other courts have held that the determination of whether someone is an independent contractor is a fact-specific question (see e.g. Matter of Empire State Towing & Recovery Assn., Inc. [Commissioner of Labor], 15 NY3d 433, 437 [2010]; Herman v RSR Sec. Services Ltd., 172 F3d 132, 139 [2d Cir 1999]; Brock v Superior Care, Inc., 840 F2d 1054, 1059 [2d Cir 1988]); Cross v Supersonic Motor Message Courier, Inc., 140 AD3d 503, 504 [1st Dept 2016][concluding that whether delivery driver was employee or independent contractor was a question of fact where, although the contract labeled the driver an independent contractor, "he was required to maintain insurance in an amount dictated by Continental, his delivery process was controlled by the Continental dispatcher, he used Continental's forms, was required to wear a Continental shirt, and the truck he drove bore the Continental logo"]).

Although we express no opinion as to whether Mr. Carlson will ultimately succeed in demonstrating that the MVP vehicle constituted a "hired auto," defendants have not shown that, as a matter of law, Mr. Carlson failed to "manifest any cause of action cognizable at law" (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]) or that defendants submitted "'documentary

evidence [to] conclusively establish[] a defense to the asserted claims as a matter of law'" (98 NY2d at 152).[4]

B.

As to the issue of whether DHL granted "permission" to MVP to use the vehicle in question, dismissal on that ground was also erroneous.[5]  "Permission" is not defined in the insurance agreement.  "While the rights and obligations of parties under insurance contracts should be determined by the specific language of the policies, if the language of the policy is susceptible of two reasonable meanings, the parties may submit extrinsic evidence of their intent at the time of contracting" (Newin Corp. v Hartford Acc. & Indem. Co., 62 NY2d 916, 919 [1984]).  There is a well-understood meaning of permission in the context of motor vehicle liability insurance, which turns not on whether the

---

[4] The dissent claims that in order to obtain coverage, "plaintiff has the burden of establishing" that the MVP vehicle was hired by DHL and used with DHL's permission.  However, we must remain mindful of the procedural posture of this case.  A plaintiff opposing a motion to dismiss pursuant to CPLR 3211 (a) (1) and (7) does not have the burden of conclusively demonstrating his or her entitlement to recovery.

[5] The Appellate Division's rationale relied on dicta from our decision in Dairylea Co-op., Inc. v Rossal (64 NY2d 1, 9-10 [1984]).  Dairylea is inapposite on several counts. First, the policy at issue there specifically excluded from coverage "the owner of a non-owned automobile," and there was "no question that the tanker was not owned by Dairylea" (id.).  The policies here contain no such exclusion.  Second, the various facts suggesting that DHL could and did exercise substantial control over MVP were not present in Dairylea.

driver had permission to use the vehicle for the particular
activity at issue, but on whether the driver had permission to
use the vehicle *at all* (i.e. the distinction between a permissive
user and a thief)(see Motor Vehicle Accident Indemnification
Corp. v Continental Nat'l Am. Group Co., 35 NY2d 260, 263-265
[1974]; Murdza v Zimmerman, 99 NY2d 375, 381 [2003]; State Farm
Mut. Auto. Ins. Co. v Taveras, 71 AD3d 606, 606 [1st Dept 2010];
Lancer Ins. Co. v Republic Franklin Ins. Co., 304 AD2d 794, 797
[2nd Dept 2003]).  That established meaning is consistent with
industry practice, public policy and DHL's insurance agreement
itself.

In Motor Vehicle Accident Indemnification Corp.,
Continental Insurance attempted to deny coverage after an
accident on the ground that the driver of a rental car was
forbidden, by the terms of the rental agreement, from driving the
car.  We held that the driver nevertheless drove the car with
constructive "permission" of the owner, as that term is used in
section 388 of the Vehicle and Traffic Law, overcoming the
restrictions on use provided by Continental in the lease.  We
wrote:

> "The restrictions sought to be imposed by
> Continental violate the public policy of this
> State . . . .   The lessor (and Continental)
> . . . knew or should have known that the
> probabilities of the car coming into the
> hands of another person were exceedingly
> great and in these circumstances they are to
> be charged with constructive consent . . .
> Any other interpretation would be placing an
> unreasonable limitation on the 'permission'

contemplated by [section 388] . . . [section 388] expresses the policy that one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant . . . To put it another way, these considerations of sound public policy will prevent the evasion of the liability of one leasing cars for profit (and in turn, his insurer) via the attempted device of restrictions on or conditions of use which run counter to the recognized realities and, in a measure, disguise the transaction"

(35 NY2d at 264-265).  Subsequently, in Murdza, we explained that "our finding of constructive consent [in Motor Vehicle Accident Indemnification Corp.] -- despite the owner's restrictions -- rested, in part, on the public policy concerns surrounding the large number of vehicles placed on the road by businesses that rent cars to others for profit, and the inevitability that these vehicles will 'become involved in their fair share of accidents'" (99 NY2d at 380, quoting Motor Vehicle Accident Indemnification Corp., 35 NY2d at 263).  The Vehicle and Traffic Law's understanding of "permission" is echoed in Insurance Law § 3420 (e), which requires an insurer (regardless of location) issuing a policy "covering liability arising from the ownership, maintenance or operation of any motor vehicle" if the vehicle is "principally garaged or principally used in this state" to insure the named insured from any liability "as a result of negligence in the operation or use of such vehicle . . . *by any person operating or using the same with the permission, express or implied, of the named insured*" (emphasis added).

Those same public policy concerns are at issue here. DHL contracted with MVP for the operation of fleets of thousands of vehicles with DHL's logos, for the purpose of the exclusive delivery of DHL's packages nationwide, including Western New York. Mr. Carlson pointed to evidence showing that MVP's trucks were used exclusively for DHL's business. Some of those trucks will inevitably become involved in their fair share of accidents, and some of those accidents will inevitably occur when a driver departs from the specified routes or driving restrictions. The record, though incomplete at this point, indicates that DHL, as the "financially responsible defendant," has procured coverage that is priced and intended to provide excess coverage for those fleets of trucks when driven by an authorized user (see 35 NY2d at 264).

Mr. Carlson's expert, who claims forty years of experience in the insurance industry, opined that, as a matter of common industry usage, "the term 'permission' in an insurance policy is broad and simply means that the operator was legally allowed to use that vehicle at the time of an accident. To put in simpler terms, in an insurance context an operator is either a permissive user or a thief who stole the vehicle" (cf. Murdza, 99 NY2d at 381 ["because the lessee gave his consent to (the third-party driver) to operate the rental vehicle () we (found) that he was operating it with the constructive consent of (the lessor) and, perforce, with the permission envisioned by the

provisions of section 388 . . . Absent the lessee's consent, the third party's operation would have been that of a thief -- the antithesis of a permissive user"][internal quotation marks and citations omitted]).  That opinion comports with our decisions in Motor Vehicle Accident Indemnification Corp. and Murdza, as well as the public policies of the State, because if "permission" could be read to limit coverage for failure to adhere to certain specifications -- such as avoiding detours or following the rules of the road -- automobile insurance companies could successfully disclaim coverage for almost any accident when the driver is not the owner of the vehicle.  That kind of "unreasonable limitation" on coverage was rejected by this court in Motor Vehicle Accident Indemnification Corp., as it did not comport with the public policy that "one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant" (35 NY2d at 264).

        DHL argues that the interpretation of "permission" is controlled by the Appellate Division's decision in Carlson v Porter (53 AD3d 1129 [4th Dept 2008]).  There, the Appellate Division concluded as a matter of law that "neither the DHL defendants nor MVP may be held vicariously liable under the theory of respondeat superior" because Porter was on a personal errand at the time of the accident and that "his employment did not create the necessity for the travel" (id. at 1132).  However, the doctrine of respondeat superior is not relevant to the issue

of permission here.  The doctrine of respondeat superior is used to determine when an employer may be held responsible for acts of an employee, not when an insurance company must provide coverage under the terms of its own policy.[6]

Under the terms of the insurance contract, coverage is not limited to circumstances where DHL is held directly liable or liable by way of the doctrine of respondeat superior.  The contract contemplates coverage in circumstances where the driver may not be an employee, or where the driver may not be acting within the scope of employment, so long as the other requirements for coverage are met.

III.

AAIC adopts the Appellate Division's rationale that because AAIC's policy was issued in New Jersey and delivered in Washington and then in Florida, it was neither issued nor delivered in New York, and therefore plaintiff cannot recover from AAIC pursuant to Insurance Law § 3420.  Our decision in

---

[6] "Under the doctrine of respondeat superior, an employer will be liable for the negligence of an employee committed while the employee is acting in the scope of his employment" (Lundberg v State, 25 NY2d 467, 470 [1969]).  The doctrine is limited: "An employee acts in the scope of his employment when he is doing something in furtherance of the duties he owes to his employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities" (id.).  Where travel is part of the employment, "the crucial test is whether the employment created the necessity for the travel" (Swartzlander v Forms-Rite Bus. Forms & Printing Serv., Inc., 174 AD2d 971, 972 [4th Dept 1991]).

Preserver resolves that question, and we now reiterate that
section 3420 applies to policies that cover insureds and risks
located in the State.

Insurance Law § 3420 allows a limited cause of action
on behalf of injured parties directly against insurers.  Section
3420 applies to policies and contracts "issued or delivered in
this state" (see Insurance Law § 3420 [a]).  Insurance Law § 3420
does not define the term "issued or delivered in this state," but
other provisions of the Insurance Law are instructive: "[T]he
proper interpretation of the term 'issued or delivered in this
state' refers both to a policy issued for delivery in New York,
and a policy issued for delivery outside of New York" (General
Counsel Opinion 09-06-2008).  In Preserver, we interpreted
section 3420 (d), which then required insurers to provide written
notice when disclaiming coverage under policies "issued for
delivery" in New York.  We held that "[a] policy is 'issued for
delivery' in New York if it covers both insureds and risks
located in this state" (10 NY3d at 642).  Thus, under Preserver,
"issued for delivery" was interpreted to mean where the risk to
be insured was located -- not where the policy document itself
was actually handed over or mailed to the insured.  We
interpreted section 3420 to provide a benefit -- deliberately in
derogation of the common law -- to New Yorkers whenever a policy

covers "insureds and risks located in this state" (id.).[7]
Applying the Preserver standard to the facts of this case, it is
clear that DHL is "located in" New York because it has a
substantial business presence and creates risks in New York.  It
is even clearer that DHL purchased liability insurance covering
vehicle-related risks arising from vehicles delivering its
packages in New York, because its insurance agreements say so.

This interpretation of "issued or delivered" is
consistent with the reasoning behind the legislature's enactment
of Insurance Law § 3420.  In 1917, the legislature created this
statutory cause of action to remedy the inequity of the common

---

[7] Although the dissent claims that the Preserver court
"relied on" the distinction between "issued or delivered" and
"issued for delivery," the basis for that claim is unsound.  The
dissent points out that the Appellate Division in American Ref-
Fuel Co. of Hempstead v Employers Ins. Co. of Wausau (265 AD2d 49
[2d Dept 2000]), cited in Preserver, notes that the phrase
"issued for delivery" is different from "issued or delivered."
However, the court in American Ref-Fuel did only that -- noted
the distinction -- but did not rely on it in making its
determination regarding section 3420(d).  Indeed, American Ref-
Fuel explains that the statute, both as originally enacted using
the words "issued or delivered," and as later amended to "issued
for delivery," at all times covered "accidents occurring in this
State" (265 AD2d at 52).  American Continental Props. v National
Union Fire Ins. Co. of Pittsburgh (200 AD2d 443, 446-447 [1st
Dept 1994]), which the dissent claims "construed the 'issued or
delivered' language as limited to where the policy had been
physically executed," held only that there was a question of fact
as to whether the policy was issued or delivered in New York
where the policy contained a New York address, was signed in New
York, countersigned in Pennsylvania, and "where a substantial
portion of the risk associated with the policy" was located in
New York.  Thus, prior to Preserver, there was no clear
distinction between the two phrases in the context of section
3420.

law rule that an injured person had no cause of action against the insurer of a tortfeasor and to protect the tort victims of New York (see Lang v Hanover Ins. Co., 3 NY3d 350, 353-354 [2004]).  "Generally, statutes designed to promote the public good will receive a liberal construction and be expounded in such a manner that they may, as far as possible, attain the end in view" (McKinney's Statutes § 341).  The overall legislative intent of Insurance Law § 3420 is to protect the tort victims of New York State, and the subsequent amendments to section 3420 were designed to expand the remedy, not to contract it.

In 2008, the legislature amended Insurance Law § 3420 to expand its reach in several respects.  The 2008 amendments were made to "restore fairness to the process and protect individuals who suffer personal injuries and families whose loved ones have died as a result of the tortious conduct of another" (DeFrancisco Letter, Bill Jacket, L 2008, ch 388 at 5; see Introducer's Mem in Supp, id. at 8; see also Weinstein Letter, id. at 6 ["(T)his progressive, forward thinking legislation will benefit insureds, injured parties, and the administration of justice"]; New York State Academy of Trial Lawyers Letter, id. at 18 ["This legislation advances the cause of justice and will improve New Yorkers' access to the courts, and their ability to seek relief for injuries and wrongful death"]).

The 2008 amendments also changed the "issued for delivery" language in subsection (d) to match the "issued or

delivered" language elsewhere in the statute. Nothing in the
bill jacket or other legislative history mentions that change, so
that it appears to have been a stylistic change with no intended
import. If anything, "issued or delivered" is facially broader
than "issued for delivery." Moreover, there is certainly no
indication that the legislature's minor amendment to subsection
(d) was intended to overturn this Court's holding in Preserver.

Interpreting "issued or delivered in this state" to
apply exclusively to policies issued by an insurer located in New
York or by an out-of-state insurer who mails a policy to a New
York address would undermine the legislative intent of Insurance
Law § 3420. It would require an assumption that the legislature
intended to remove coverage benefitting injured New York
residents if the policy was mailed from another state, but to
increase coverage for foreign victims injured elsewhere so long
as the policy was mailed to New York or underwritten by a New
York-based insurer -- hardly plausible in light of the express
purposes of section 3420 and the 2008 Amendments.

The dissent suggests that, "[g]iven the sharp change in
the meaning of 'issued or delivered,' and the frequency with
which that phrase is used," our holding today will "wreak havoc"
in unspecified ways.[8] That is not the case. Today's

---

[8] The dissent's questions about the effects of our decision
fail to take into account two things: (1) an insurance company
will be subject to suit in New York only if a New York court has
personal jurisdiction over it; and (2) section 3420 applies to

interpretation of "issued or delivered" to include policies that
cover both insureds and risks located in the state is not a
"sharp change"; that interpretation is consistent with Preserver
and the legislative history of section 3420 and the 2008
Amendments.  The fact that the phrase "issued or delivered"
exists in other provisions of the Insurance Law does not affect
the analysis, for a few reasons.  First, although "issued or
delivered" appears in other parts of the Insurance Law, we have
yet to interpret the phrase in any of those other contexts.
Thus, decrying our interpretation of "issued or delivered"
because it might affect the interpretation of those same words in
other provisions would apply equally to the adoption of the
dissent's view: any interpretation would have that effect.

        Second, we do not here purport to judge the meaning of
the words "issued or delivered" in any context other than section
3420.  Identical words may be used in different contexts with
different meanings and different legislative histories, and we do
not foreclose any such interpretations by our decision here.

        Third, the dissent would restrict section 3420 (d) to
policies that were either issued in New York or delivered to New
York, and would exclude, for example, an insurance policy issued
by a national insurer located in Connecticut to a retailer
operating in all fifty states, if the policy was delivered to the
retailer's headquarters in Arkansas -- even if the policy was

_____

policies that cover *both* insureds *and* risks located in New York.

specifically written to cover risks in New York created by the insured's extensive operations in this state.  The same concerns that animate our consideration of section 3420 are also relevant to and consistent with the purpose of other provisions of the Insurance Law, which has as its overriding purpose the protection of New Yorkers and the coverage of injuries occurring in New York (see e.g. Insurance Law § 1213 [declaring the legislature's concern that out-of-state insurers present New York residents "the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies," and therefore providing that any transaction of business or solicitation thereof by a foreign insurer constitutes authorization for the Superintendent of Insurance to accept process for that insurer]).  The dissent's interpretation of "issued or delivered" would allow an insurer to avoid compliance with many of the provisions of the Insurance Law simply by mailing the policy to the insured's secondary location, even though the risks contemplated by the policy existed entirely within New York.  It is simply not plausible that the legislature intended the provisions of the Insurance Law to be so easily evaded by companies doing business in New York and purporting to cover risks in New York.

In light of the above, we conclude that the term "issued or delivered" does not alter our conclusion in Preserver, and that section 3420 (a) encompasses situations where both

insureds and risks are located in this state. In so holding, we further conclude that the policies here fall within the purview of Insurance Law § 3420, and Mr. Carlson may maintain his Insurance Law § 3420 cause of action against AAIC, subject, of course, to his ability to prove coverage.

IV.

Mr. Carlson's remaining claims are without merit, and we review them briefly.

General Business Law § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade[,] or commerce or the furnishing of any service in [New York] are . . . unlawful" (General Business Law § 349 [a]).  We have held that "[s]ection 349 does not grant a private remedy for every improper or illegal business practice, but only for conduct that tends to deceive consumers" (Schlessinger v Valspar Corp., 21 NY3d 166, 172 [2013]).  "As a threshold matter, in order to satisfy General Business Law § 349 plaintiffs' claims must be predicated on a deceptive act or practice that is 'consumer oriented'" (Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330, 344 [1999], quoting Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 24-25 [1995]).  Mr. Carlson's allegations demonstrate that this action is merely a "'private' contract dispute over [insurance] policy coverage," which does not "affect[] the consuming public at large," and therefore falls outside the purview of General Business Law § 349 (New York Univ. v

Continental Ins. Co., 87 NY2d 308, 321 [1995]; see Oswego

Laborers' Local 214 Pension Fund, 85 NY2d at 25).

"The elements of a cause of action for fraud require a

material misrepresentation of a fact, knowledge of its falsity,

an intent to induce reliance, justifiable reliance by the

plaintiff[,] and damages" (Eurycleia Partners, LP v Seward &

Kissel, LLP, 12 NY3d 553, 559 [2009]; see Lama Holding Co. v

Smith Barney, 88 NY2d 413, 421 [1996]).  In an action for fraud,

"the circumstances constituting the wrong shall be stated in

detail" (CPLR 3016 [b]).  Here, Mr. Carlson does not allege, with

sufficient particularity, details demonstrating that the

defendants engaged in any fraud.  His allegations concerning

defendants' alleged misrepresentations and bad faith refusal to

settle the claim are purely conclusory in nature and duplicative

of his direct action pursuant to Insurance Law § 3420 and

therefore fail to state a cause of action (see New York Univ., 87

NY3d at 320).  Finally, New York does not recognize a

freestanding claim for conspiracy (see Alexander & Alexander of

N.Y. v Fritzen, 68 NY2d 968, 969 [1986] ["a mere conspiracy to

commit a (tort) is never of itself a cause of action"]).  In

light of the above, Mr. Carlson's remaining claims were properly

dismissed.

Accordingly, the orders of the Appellate Division

should be modified, without costs, by denying defendants' motions

to dismiss the first cause of action and, as so modified,

affirmed.

Carlson v American International Group, Inc. et al.

No. 47

GARCIA, J.(dissenting):

The vehicle involved in the tragic accident underlying this case was not a "hired auto" under settled principles of insurance law (see Dairylea Coop. v Rossal, 64 NY2d 1, 9-10 [1984]; see also Toops v Gulf Coast Marine Inc., 72 F3d 483, 487-488 [5th Cir 1996]; 8A Couch on Ins. § 118:49). I would therefore affirm on that basis.

I.

In April 2004, MVP Delivery and Logistics, Inc. (MVP) entered into a cartage agreement with DHL Express (USA) Inc. (DHL) to provide package delivery services in the Western New

- 1 -

York region.  The agreement expressly identified MVP as an independent contractor.  As such, MVP owned and registered the vehicles in its delivery fleet.  MVP also maintained control over its employees and the manner and means of its performance under the cartage agreement. Pursuant to the terms of the agreement, MVP obtained a $1 million liability insurance policy to cover the vehicles.

On July 7, 2004, an MVP delivery van, driven by employee William Porter, collided head-on with another vehicle. The driver of that vehicle died thirteen days later as a result of the injuries she sustained in the crash.  At the time of the accident, William Porter was running a personal errand on a scheduled break.

In the underlying wrongful death litigation, a jury awarded Michael Carlson, in both his individual capacity and as administrator of his deceased wife's estate, $20 million against William Porter, MVP, and DHL.  The Appellate Division reversed the judgment against MVP and DHL, reasoning that MVP and DHL could not be held vicariously liable on a theory of *respondeat superior* because Porter's employment did not create the need for the travel (Carlson v Porter, 53 AD3d 1129, 1132 [4th Dept 2008]).  In other words, Porter exceeded the scope of his employment by running a personal errand at the time of the accident. MVP was nonetheless still held statutorily liable as owner of the vehicle (see Vehicle and Traffic Law § 388).  The

Appellate Division also set aside the damages award as excessive and plaintiff stipulated to a reduced judgment of $7.3 million. To date, plaintiff has received approximately $1.1 million from MVP's insurance carrier.

Seeking to satisfy the deficient judgment, plaintiff, in his individual capacity and as administrator of his wife's estate, commenced this action under Insurance Law § 3420 (b).[1] Specifically, plaintiff seeks to recover from DHL's insurers on the theory that the MVP vehicle was a "hired auto" within the meaning of DHL's insurance policies. As such, MVP would be an "insured" under those policies.

Three DHL insurance policies are relevant here. First, National Union Fire Insurance Company of Pittsburgh (National Union), a subsidiary of American International Group, Inc. (AIG), issued DHL's primary insurance policy in the amount of $3 million. This liability policy contained a "hired auto" provision defining an insured as anyone "using with your permission a covered auto you own, hire or borrow . . . ." Second, National Union issued a $23 million umbrella policy defining an insured as "[a]ny person . . . or organization with respect to any auto owned by you, loaned to you or hired by you

_____

[1] Subject to certain limitations, section 3420 (b) provides that "an action may be maintained . . . against the insurer upon any policy or contract of liability insurance . . . to recover the amount of a judgment against the insured or his personal representative" (Insurance Law § 3420 [b]; see section III, infra).

on your behalf and used with your permission . . . ."  Under both policies, "you" means a named insured, which explicitly includes DHL but not MVP or any other independent contractor.  Third, DHL purchased a $2 million excess policy from American Alternative Insurance Company (AAIC), which followed the form of DHL's primary insurance policy.

These defendant insurance companies moved to dismiss this action under CPLR 3211 (a) (1) and 3211 (a) (7).  Supreme Court, Niagara County denied the motions insofar as the insurers sought dismissal under Insurance Law § 3420.  The court rejected AAIC's argument that the excess policy had not been "issued or delivered" in New York, as required by Insurance Law § 3420 (a), because the accident took place while the named insured was doing business within the state.  After limited discovery, the same court concluded that the pleadings were sufficient to allege that the MVP vehicle constituted a "hired auto" under the relevant policies.

On appeal, the Appellate Division reversed and granted the motion to dismiss, concluding that plaintiff could not state a claim against National Union because DHL did not "hire" the vehicle in question and could not have given MVP permission to use MVP's own vehicle (130 AD3d 1479, 1481 [4th Dept 2015]).  As a result, MVP was not an "insured" under the applicable policies.  In a companion appeal, the Appellate Division also dismissed the first cause of action against AAIC (130 AD3d 1477, 1477-1478 [4th

Dept 2015]).  The court reasoned that the excess policy had not been "issued or delivered in this state" as required by Insurance Law § 3420 (a) (2).  This Court subsequently granted leave to appeal.

II.

The majority holds that whether MVP is an "insured" under DHL's insurance policies presents a question of fact to be resolved by a jury.  I disagree.  The cartage agreement on its face establishes that MVP is an independent contractor responsible for the purchase, operation, and maintenance of its delivery fleet.  As such, MVP exercised meaningful control over its vehicles, thereby precluding "hired auto" coverage, as a matter of law, under the relevant insurance policies.

A.

"The key inquiry regarding whether an automobile will fall within the hired automobiles provision of [a] policy is whether the insured exercised dominion, control, or the right to direct the use of the vehicle" (8A Couch on Ins. § 118:49).[2]  In other words, the issue is whether the underlying agreement is for the *services* of the independent contractor or for the *vehicle used* in providing those services (see id.; Dairylea Coop. v Rossal, 64 NY2d 1, 9-10 [1984]; Transport Indem. Co. v Liberty

---

[2] "Other factors in determining control may include control over the driver of the vehicle, control of decisions affecting the operations of the vehicle, responsibility for maintenance of the vehicle, and responsibility for maintaining liability insurance for the vehicle" (8A Couch on Ins. § 118:49).

Mut. Ins. Co., 620 F2d 1368, 1371 [9th Cir 1980]).  A business

should not be liable for its independent contractor's use of the

vehicles if the business cannot control the manner in which those

vehicles operate (see Chainani v Bd. of Educ. of City of N.Y., 87

NY2d 370, 380-381 [1995]; Kleeman v Rheingold, 81 NY2d 270, 274

[1993]). That was clearly the case here.

MVP, not DHL, owned the delivery vehicle at issue.

Accordingly, to obtain coverage, plaintiff has the burden of

establishing that the MVP vehicle was (1) "hired" by DHL and (2)

used with DHL's permission at the time of the accident.  Here,

the fourteen-page cartage agreement, read in conjunction with the

insurance policies, conclusively defeats plaintiff's "hired auto"

claim.

By its very terms, the cartage agreement referred to

MVP as an independent contractor.  As such, MVP maintained sole

control over the manner and means of its performance:

> "3.3 Manner of Performance. Subject to the terms and
> conditions of this agreement by which Contractor
> performs the Services shall be *at Contractor's sole
> discretion and control* and are Contractor's sole
> responsibility, including, with respect to (a) the
> hours and days worked by Contractor Workers, (b) the
> selection and supervision of Contractor Workers, and
> (c) the number of Contractor Vehicles used by
> Contractor in providing the Services. Contractors shall
> have the *sole right to determine all aspects of its
> performance of its obligations* under the Agreement,
> including the staffing, operation, and routing of the
> Contractor Vehicles in the Service Areas . . . ."

(Cartage Agreement at ¶ 3.3 [emphasis added]). This "manner of

performance" provision clearly establishes the parties' intent

that MVP would maintain control over the operation of its vehicles.  DHL did not have authority to make decisions affecting the day-to-day operations of MVP's vehicles.

The cartage agreement further provides MVP with exclusive control over the purchase and maintenance of its delivery vehicles (see id. at ¶ 3.5.1 ["Contractor Vehicles. Without limiting the generality of Section 3.3, *Contractor, at is sole cost and expense, shall obtain, furnish, operate, and maintain in good working condition such Contractor Vehicles as may be necessary for Contractor to perform the Services in accordance with the provisions of this Agreement*"][emphasis added]).  Moreover, MVP was solely responsible for the licensing, registration, and insurance of its delivery vehicles (see id. at ¶ 3.5.2; ¶ 12.1 ["(MVP) shall, at its sole cost and expense, maintain in effect continual insurance coverage . . . . All such insurance coverages . . . shall be primary to, and shall receive *no contribution* from any other insurance maintained by, on behalf of, or benefitting DHL"] [emphasis added]).  Finally, the agreement specified that MVP was responsible for the hiring, training, and firing of all its employees (see id. at ¶ 3.4). Clearly, pursuant to the cartage agreement, MVP maintained direct control over the purchase, operation, and maintenance of its vehicles -- and more. MVP, among other things, selected individual drivers, selected delivery routes, loaded and unloaded the vehicles, and furnished the vehicles with gas and other

supplies.

As the majority notes, the cartage agreement contained strict regulations for, among other things, the vehicles' operating and performance standards, the vehicles' markings, employee uniforms, and employee standards of conduct. DHL also had the right to inspect MVP's records and audit its compliance with the agreement. MVP even used DHL's facilities and housed its vehicles on site. The majority stresses these aspects of the business relationship in holding that there is a cognizable factual dispute here (see majority op at 9-10). However, none of these requirements in the cartage agreement -- with the limited exception of vehicle performance standards -- affect the MVP vehicles in their *functional* or *operational* capacities. The markings requirement, for instance, simply reflects DHL's control over its own intellectual property and brand, not the vehicle itself. Accordingly, even assuming DHL exercised some "supervisory powers," MVP was still an independent contractor responsible for its own performance (see Chicago Ins. Co. v Farm Bureau Mut. Ins. Co. of Arkansas, Inc., 929 F2d 372, 374 [8th Cir 1991]).

Absent any indication that DHL specifically hired MVP's vehicles for its own exclusive control, there can be no "hired auto" coverage as a matter of law (see American Cas. Co. of Reading, Pa. v Denmark Foods, 224 F2d 461, 463 [4th Cir 1955]). I would therefore hold that MVP -- an independent contractor

solely responsible for the purchase, operation, and maintenance of its vehicles -- exercised such exclusive control over the vehicle so as to preclude "hired auto" coverage.

## B.

That result is the same one we reached in Dairylea Coop. v Rossal (64 NY2d 1 [1984]). There, R&H Hauling, an independent contractor, entered into a hauling contract with Dairylea Cooperative, Inc. and an accompanying lease agreement for a tanker truck. Several months later, R&H purchased the tanker with Dairylea retaining a security interest. The truck, which was still titled in Dairylea's name, was subsequently involved in an accident with another vehicle while being driven by a R&H employee. After a jury returned a verdict for the plaintiff in the underlying personal injury action, Dairylea and R&H's insurers initiated a declaratory judgment action to determine coverage. Much like the insurance policies at issue here, Dairylea's insurance policy defined an insured as "any other person while using an owned automobile or a hired automobile with the permission of the named insured" (id. at 9).

We held in Dairylea that the truck did not constitute a "hired auto" under Dairylea's insurance policy. In doing so, we emphasized the fact that the hauling contract between the parties called for R&H to transport milk as an independent contractor, and did not require the use of a particular tanker to perform

that service (see id. at 9-10).  Even though Dairylea still had title to the truck and the truck still carried license plates issued to Dairylea, we concluded that "it cannot be said in any realistic sense that once the . . . agreements and note were executed, Dairylea had any control over use of the tanker or could grant R&H permission to use it" (id. at 10).  We further observed that "as the owner of the tanker, R&H had the right to use it without permission from Dairylea or anyone else" (id.).

Similarly, here, the cartage agreement between DHL and MVP explicitly refers to MVP as an independent contractor.  The agreement makes no mention of specific vehicles to be used in the performance of the contract.  The agreement is a contract for MVP's services -- not its vehicles -- and, as owner of those vehicles, MVP retained significant control over their operation.  In short, Dairylea is not meaningfully distinguishable from the instant case, compelling the same result.[3]

Our decision in Dairylea reflects the nationwide consensus on "hired auto" coverage (see e.g. Toops v Gulf Coast

---

[3] The majority suggests that Dairylea is distinguishable because "the policy at issue there specifically excluded from coverage 'the owner of a non-owned automobile,' and there was 'no question that the tanker was not owned by Dairylea'" (majority op at 11 n 3, quoting Dairylea, 64 NY2d at 9-10).  But "the policy definition of 'insured' included, in addition to Dairylea, 'any other person while using an owned automobile *or a hired automobile with the permission of the named insured*'" (id. at 9 [emphasis added]).  We held that "the tank farm milk hauling contract" between Dairylea and R&H did not "constitute the tanker a hired automobile within the meaning of that provision" (id.).

Marine, Inc., 72 F3d 483, 487 [5th Cir 1996] ["(I)n order for a vehicle to constitute a hired automobile it must be under the named insured's exclusive use or control"]; Sprow v Hartford Ins. Co., 594 F2d 418, 422 [5th Cir 1979] ["(F)or a vehicle to constitute a hired automobile, there must be a separate contract by which the vehicle is hired or leased to the named insured for his exclusive use or control"]; Russom v Ins. Co. of North America, 421 F2d 985, 993 [6th Cir 1970] ["Where there is a separate contract for hiring or leasing a vehicle in addition to an agreement to haul a particular load, courts have held that the vehicle becomes a 'hired automobile'"]; Phillips v Enterprise Transp. Serv. Co., 988 So2d 418, 422 [Miss Ct App 2008] [citing Toops and Sprow for the proposition that the vehicle must be hired or leased for the named insured's exclusive use or control]).  Courts have also held that independent contractor status cannot create "hired auto" coverage as a matter of law (see e.g. Chicago Ins. Co., 929 F2d at 374; Transport Indem. Co., 620 F2d at 1371; American Cas. Co., 224 F2d at 463).[4]

---

[4] The majority asserts that MVP's status as an independent contractor is just another "factor to be weighed with others" and "is not dispositive of the issue of control" (majority op at 10). But the cases cited from this Court address whether an employment relationship exists within the meaning of the unemployment insurance law (see Matter of Rivera [State Line Delivery Serv.-Roberts], 69 NY2d 679, 682 [1986]; Matter of Empire State Towing & Recovery Assn., Inc. [Commission of Labor], 15 NY3d 433, 437 [2010]).  Employment is defined broadly within the meaning of the unemployment insurance law to effectuate its remedial purpose (see Labor Law §§ 501, 511 [a] [1]). Those policy concerns do not apply here.

Accordingly, based on the face of the cartage agreement,
plaintiff cannot, as a matter of law, meet his burden of proving
coverage (see Cons. Ed. of N.Y. v Allstate Ins. Co., 98 NY2d 208,
218 [2002]).

C.

Relying on the standard of review on a motion to
dismiss, the majority holds that "[w]hether MVP was an insured
under DHL's policies presents a question of fact to be resolved
by the trier of fact" (majority op at 2).  According to the
majority, "the insurance policies do not define 'hired auto,' and
neither the Appellate Division nor defendants point to any
industry-standard definition" (id. at 8).  The majority opinion
then relies heavily on an expert affidavit proffered by plaintiff
to conclude that a jury should determine whether the vehicle was
a "hired auto."  The majority even implies that a "missing"
Schedule of Hire, which is purportedly "essential to [the]
determination of the full content of the contract[,]" is
admissible through the parol evidence rule (id. at 7).

But "a written agreement that is complete, clear and
unambiguous on its face must be enforced according to the plain
meaning of its terms" (Greenfield v Philles Records, Inc., 98
NY2d 562, 569 [2002]).  The rule's operation is no different in
the context of insurance contracts: "[w]here the terms of an
insurance policy are clear and unambiguous, interpretation of
those terms is a matter of law for the court" (Town of Harrison v

Nat'l Union Fire Ins. Co. of Pittsburgh, 89 NY2d 308, 316 [1996];
see also White v Continental Cas. Co., 9 NY3d 264, 267 [2007]
["(U)nambiguous provisions of an insurance contract must be given
their plain and ordinary meaning"]).  We have, in Dairylea,
defined the parameters of hired auto coverage, consistent with
the interpretations adopted by courts in a number of states, and
that definition should govern here.  Yet, instead, the majority
impermissibly uses extrinsic evidence "to create an ambiguity in
a written agreement which is complete and clear and unambiguous
upon its face" (W.W.W. Associates, Inc. v Giancontieri, 77 NY2d
157, 163 [1990]).[5]  Consequently, under the majority's holding, a
plaintiff may now use extrinsic evidence to alter the express
terms of an insurance policy whenever an insurer moves to dismiss
the action.

        Insurers rely on the established meaning of legal terms
to define the scope of coverage and the concomitant level of
risk; "the meaning of such provisions is not an issue of fact to
be litigated anew each time a dispute goes to court" (Unigard
Sec. Ins. Co. v N. River Ins. Co., 4 F3d 1049, 1071 [2d Cir
1993]).  Under the majority's interpretation, plaintiffs may now
point to information outside the four corners of the governing
insurance contract to generate ambiguity and manufacture a
"triable issue of fact."

---

        [5] Indeed, the majority fails to note that plaintiff
originally conceded that the terms of the policies were
unambiguous.

The majority also appears to suggest that MVP and William Porter had implied permission to operate the vehicle under Vehicle & Traffic Law § 388 (1) (see majority op at 12-14). That statute provides that "[e]very owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner" (Vehicle & Traffic Law § 388 [1]).  By definition, however, section 388 only applies to an "owner of a vehicle used or operated in this state" (id. § 128).  It is undisputed that MVP -- not DHL -- owned the van and, pursuant to section 388, MVP is the party that must give permission.

The majority also relies on the public policy considerations underlying section 388.  In Motor Vehicle Accident Indemnification Corp v Continental Nat'l Am. Group Co., for example, we held that a driver of a rental car had the constructive permission of the owner, overcoming the permissive-use restrictions found in the lease agreement (35 NY2d 260, 264-265 [1974]).  Later, in Murdza v Zimmerman, we explained that "[o]ur finding of constructive consent -- despite the owner's restrictions -- rested, in part, on the public policy concerns surrounding the large number of vehicles placed on the road by businesses that rent cars to others for profit, and the

inevitability that these vehicles will 'become involved in their fair share of accidents'" (99 NY2d 375, 380 [2003], quoting Motor Vehicle Accident Indemnification Corp., 35 NY2d at 263). If anything, these cases undermine the majority's position.

The constructive permission theory applied in Motor Vehicle Accident Indemnification Corp. and Murdza is intended to ensure that a financially responsible defendant, as owner or renter, cannot avoid liability by claiming an insolvent user did not have actual permission (see Morris v Snappy Car Rental, Inc., 84 NY2d 21, 27 [1994]). But DHL is not a car rental company leasing numerous cars for profit with restrictive use agreements that limit its exposure to liability. DHL contracted with MVP for its services in a commercial, arms-length agreement -- not a rental agreement. DHL required MVP to keep, at a minimum, a $1 million liability insurance policy -- well above the minimum automobile liability coverage required in New York State (see Vehicle and Traffic Law § 345 [b] [3] [requiring motorists to carry a minimum amount of liability insurance of $50,000 for death of one person, $100,000 for death of two or more people, and $10,000 for property damage in any one accident]). The public policy underlying these constructive permission decisions -- involving owners placing "fleets of vehicles" on the road with the risk that restrictive rental agreements will leave injured plaintiffs without recourse to an insured motorist -- is simply not implicated here.

The case before us involves a straightforward application of contract interpretation and settled insurance law. Rather than apply those established principles, the majority's approach permits litigants to introduce extrinsic evidence to create ambiguity in contracts, upsetting not only our own precedent but the settled expectations of parties to commercial agreements. I would instead apply our longstanding precedent and affirm the Appellate Division's holding that the vehicle was not a "hired auto."

III.

Affirming on these grounds would dispose of the case without consideration of the second issue -- the application of Insurance Law § 3420 (a). Reaching the issue, the majority misinterprets section 3420 (a) in a manner that enacts sweeping change across the Insurance Law, generating substantial implications, both known and unknown.

Section 3420 (a) of the Insurance Law mandates specified provisions to be included in certain insurance policies and contracts "issued or delivered in this state." Section 3420 (b), in turn, provides a direct cause of action "against the insurer upon any policy or contract of liability insurance that is governed by such paragraph, to recover the amount of a judgment against the insured or his personal representative." In other words, "Insurance Law § 3420 grants an injured plaintiff the right to sue a tortfeasor's insurance company to satisfy a

judgment obtained against the insurer" (Lang v Hanover Ins. Co., 3 NY3d 350, 352 [2004]).

In order to recover under Insurance Law § 3420, a plaintiff must first establish that the policy sued upon was "issued or delivered" in New York (Insurance Law § 3420 [a]; American Continental Props. v National Union Fire Ins. Co. of Pittsburgh, 200 AD2d 443, 446 [1st Dept 1994]).  This requirement is a statutory prerequisite; failure to satisfy it will result in dismissal for lack of capacity to sue (see Lang, 3 NY3d at 354-355).  The right to sue a tortfeasor's insurance company to satisfy a judgment obtained against that tortfeasor did not exist at common law, and therefore section 3420 -- a statute in derogation of the common law -- must be narrowly construed (see Lang, 3 NY3d at 353; Allstate Ins. Co. v Rivera, 12 NY3d 602, 699 n 1 [2009]).

The majority holds that dismissal of the cause of action against AAIC was improper under the standard announced in Preserver Ins. Co. v Ryba (10 NY3d 635 [2008]).  In Preserver, we considered a different provision of section 3420 -- section 3420 (d) (2) -- which requires insurers to meet certain requirements to "disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state."  At the time, section 3420 (d) (2) applied to insurance policies "delivered or *issued for delivery* in this state" (former Insurance Law § 3420 [d] [2]

[emphasis added]).[6]  Interpreting the first part of that phrase,
we observed that the policy was "actually delivered" outside of
New York and, turning to the second part of that phrase, we held
that "[a] policy is 'issued for delivery' in New York if it
covers both insureds and risks located in this state" (10 NY3d at
642). Specifically, we held that the policy at issue was not
"issued for delivery" in New York because the insured was "a New
Jersey company, with its only offices located in that state," and
therefore could not be considered an insured located in New York
(id.).

        "Issued for delivery" -- the phrase then used in
section 3420 (d) (2) -- is *not* the phrase used in section 3420
(a) -- the provision at issue here.  Instead, section 3420 (a)
provides that the policy must be "*issued or delivered*" in New
York (Insurance Law § 3420 [a] [emphasis added]).  Those phrases
-- "issued or delivered" (used in section 3240 [a]) and
"delivered or issued for delivery" (formerly used in section 3420
[d] [2]) -- are two distinct phrases in the Insurance Law that,
our cases make clear, have quite different meanings.

        In holding that an insurance policy is "issued for
delivery" if it covers both insureds and risks in New York, the
Preserver Court cited American Ref-Fuel Co. of Hempstead v
Employers Ins. Co. of Wausau (Preserver, 10 NY3d at 642, citing

---

        [6] This "issued for delivery" language was later amended to
"issued or delivered" (see Insurance Law § 3420 [d] [2], as
amended by L 2008, ch 388, § 5).

American Ref-Fuel, 265 AD2d 49, 53 [2d Dept 2000]).  American
Ref-Fuel held that an insurance policy was "issued for delivery"
in New York where the policy expressly listed, as a named
insured, a New York corporation (265 AD2d at 53).  In so holding,
the court expressly noted that "the language in issue here,
'delivered or issued for delivery in this State' *differs from the
language in . . . Insurance Law § 3420 (a)*, applicable to
policies 'issued or delivered in this State" (American Ref-Fuel,
265 AD2d at 52 [emphasis added]).  To highlight the distinction
between the two phrases, American Ref-Fuel contrasted another
case, American Continental Props. v National Union Fire Ins. Co.
of Pittsburgh, which construed the "issued or delivered" language
as limited to where the policy had been physically signed and
executed (American Continental Props., 200 AD2d 443, 446-447 [1st
Dept 1994]).  Evidently, the Preserver Court was not only aware
of the distinction between the two phrases -- "issued for
delivery" and "issued or delivered" -- but relied on that
distinction in defining "issued for delivery."

        The majority asserts that, "[i]f anything, "issued or
delivered" is facially broader than "issued for delivery"
(majority op at 20).  This misrepresents the former statutory
language in Insurance Law § 3420 (d), which covered policies
"delivered or issued for delivery" in the State (Preserver, 10
NY3d at 642).  The true crux of the dispute here is whether the
term "issued" (in this State) is facially broader than, or

identical to, the phrase "issued for delivery" (in this State) and, when presented in that manner, the question must be plainly be answered in the negative.

Recognizing the distinction between the terms, the Appellate Division in this case properly dismissed the cause of action against AAIC:

> "The parties and the court have improperly conflated the phrase 'issued or delivered' with 'issued for delivery,' which was used in the former version of Insurance Law § 3420(d), and therefore the definition of 'issued for delivery' is not relevant here."

(Carlson, 130 AD3d at 1477-1478).  The excess policy was issued by AAIC from New Jersey and delivered to the insured in Washington and then in Florida.  Thus, the policy was not "issued or delivered in this state" as that phrase is ordinarily understood (id. at 1478; see also Taggert v Security Ins. Co. of New Haven, Conn., 277 AD 1051, 1051 [2d Dept 1950] ["A policy of insurance is issued when it is delivered and accepted, whereby it comes into full effect and operation as a binding mutual obligation, or when it is prepared and signed, as distinguished from its delivery to the insured"]; cf. American Continental Props., 200 AD2d at 446-447 [questioning where the endorsements were signed and therefore finding a question of fact as to whether a policy was "issued or delivered" in New York]).

Rather than give "issued or delivered" the plain meaning it has previously been assigned, the majority -- attempting to rectify a perceived injustice -- defines two

distinct terms to have identical meaning (McKinney's Statutes §
236 ["When . . . the Legislature uses unlike terms in different
parts of a statute, it is reasonable to infer that a dissimilar
meaning is intended."]; Albano v Kirby, 36 NY2d 526, 530 [1975]).
In doing so, the majority rewrites the Insurance Law to make
"issued or delivered" mean "issued for delivery" each and every
time it appears -- and it frequently appears (see Insurance Law §
1101 [b] [2] [C]; id. §§ 1213 [a], [d]; id. §§ 3102 [b] [1] [F],
[b] [3], [b] [c], [f] [1], [f] [2]; id. §§ 3221 [k] [6] [A], [k]
[6] [B], [I] [5] [B] [i], [p] [3] [E] [ii]; id. §§ 3407 [a], [b];
id. § 3446 [c]; id. § 3451 [a] [1]; id. § 3452 [a] [1]; id. §
4106; id. § 4207 [c]; id. § 4216 [c] [2] ; id. §§ 4231 [d], [g]
[1] [D], [g] [1] [E]; id. § 4306; id. § 4510 [c]; id. § 6409
[a]). Given the sharp change in the meaning of "issued or
delivered," and the frequency with which that phrase is used, the
majority's holding will surely wreak havoc well beyond this case.
The majority's assertion that its holding may be confined to
Insurance Law § 3420 is belied by our rules of statutory
construction, which will not allow us to disregard the plain
language of other Insurance Law provisions, identical to that
interpreted here, due to variances in context or legislative
history, as the plain language of the statute is paramount and we
can hardly ascribe differing meanings to like terms found
throughout the Insurance Law.

          Moreover, the majority's claim that a literal

interpretation of the phrase "issued or delivered" would permit insurers to regularly insure risks located in New York while simultaneously avoiding application of the Insurance Law is exaggerated and unavailing.  The legislative intent of the provisions at issue was to alter the common law rule that "'an injured person possessed no cause of action against the insurer of the tort feasor' . . . because there was no privity of contract between plaintiff and the insurance carrier" (Lang, 3 NY3d at 353, quoting Jackson v Citizens Cas. Co., 277 NY 385, 389 [1938]).  This legislative intent is still effected by giving the terms "issued or delivered" their plain meaning because New York residents may, contrary to the common law rule, pursue actions (in accordance with section 3420) directly against an insurer who issues or delivers an automobile insurance policy in New York. Significantly, New York residents will still benefit from an insurance policy issued or delivered outside the State -- they just may not be able to sue the insurer directly in New York.[7] Indeed, the legislature has seen fit to ensure that policies that

---

[7]  States may explicitly provide for such actions under appropriate circumstances (see e.g. Wis Stat § 803.04 [2] [a] ["If the policy of insurance was issued or delivered outside this state, the insurer is . . . made a proper party defendant *only if the accident, injury or negligence occurred in this state*"] [emphasis added]; La Stat § 1269 [B] [2] ["This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, *provided the accident or injury occurred within the state of Louisiana*"] [emphasis added]).

may not be issued or delivered in the State, but which cover automobiles that present a significant risk to the residents of New York, must comply with specific provisions of the Insurance Law (see e.g. Insurance Law § 3420 [e] [governing any insurance policy issued or delivered by an authorized insurer "upon any such vehicle or aircraft or vessel then principally garaged or principally used in this state"]; Insurance Law §§ 3411, 3412 [governing insurance policies on vehicles "registered in this state"]).  The majority's interpretation ignores these plain language distinctions.

While the majority claims that it is "simply not plausible" to conclude that the legislature intended to exclude policies issued or delivered outside the State because of the potential burden on New York residents in pursuing insurers in their home states, it is hardly plausible that the legislature intended to require every automobile insurer throughout the country -- regardless of where the policy was issued or delivered -- to comply with New York insurance statutes on the chance that the insured vehicle may be driven into New York.[8]  Given that

_____

[8] While the majority may take issue with this statement, its opinion provides no basis for drawing a distinction between an insured who drives a vehicle into New York and causes an accident and the situation presented here, where the purported insured has a business in New York.  Indeed, the majority opinion raises many questions regarding whether and when an insured and risk would be located in New York.  For example, what will occur when an out-of-state resident owns property in New York, or works in New York, or simply vacations regularly in New York, and drives a vehicle into the State?  Will the out-of-state insurers of an

many of the provisions of section 3420 governing policies issued or delivered in the state govern the relationship between the insured and the insurer, it is also hardly plausible that the New York legislature intended to dictate the relationship between out-of-state insureds and out-of-state insurers.  It is questionable whether the legislature would even have the authority to do so (see 8 Couch on Ins. § 111:27 ["(a) state legislature does not have the power to prescribe the contents of insurance policies that are issued or delivered outside of that respective state's borders"]).

This unhappy result may be avoided -- the vehicle was not a "hired auto" and we should leave it at that.  I respectfully dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Orders modified, without costs, by denying defendants' motions to dismiss the first cause of action and, as so modified, affirmed. Opinion by Judge Wilson.  Judges Rivera, Feinman and Eng concur. Judge Garcia dissents in an opinion, in which Chief Judge DiFiore and Judge Stein concur.  Judge Fahey took no part.

Decided November 20, 2017

---

insurance policy delivered out of state be subject to direct suit in New York under such circumstances?  It would appear so under the majority's interpretation.