Hobish v AXA Equit. Life Ins. Co. (2025 NY Slip Op 00183)

Hobish v AXA Equit. Life Ins. Co.

2025 NY Slip Op 00183

Decided on January 14, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on January 14, 2025

No. 124 

[*1]Richard Hobish, & c. et al., Appellants,
v
AXA Equitable Life Insurance Company, Respondent.

Gary J. Malone, for appellants.
Larry H. Krantz, for respondent. 

TROUTMAN, J.

In this action, plaintiffs bring claims for breach of contract and a violation of General Business Law § 349 against defendant AXA Equitable Life Insurance Company in connection with the purchase of a universal life insurance policy in 2007 and defendant's decision to increase the effective cost of that policy in 2015. Before us are plaintiffs' challenges to the trial court's grant of defendant's summary judgment motion on plaintiffs' contract claim and several of their damages theories and denial of plaintiffs' cross-motion for summary judgment. We agree with the decisions of the courts below and affirm.

n early 2007, the Hobish Irrevocable Trust purchased an Athena Universal Life Insurance II (AULII) life insurance policy from defendant to insure Toby Hobish, then 82 years old. The policy provided for a $2 million death benefit if the policy remained in effect at the time of Ms. Hobish's death.
Upon purchase of such a policy, an AULII policyholder opened a "Policy Account" with defendant and could make flexible premium payments into the account at their discretion. Defendant deducted a monthly charge, known as a "COI charge" (cost of insurance), from the account. The account accrued interest, and the COI charge applicable to the account would increase as the balance decreased, creating incentives for the policyholder to make premium payments in sums higher than the minimum necessary to pay the COI charge on a month-to-month basis. While the [*2]policy imposed no mandatory scheduled premium payment, the account would enter a grace period before ultimately lapsing if the account balance became insufficient to meet the monthly COI charge. At that point, the policyholder would become ineligible to receive the death benefit upon the insured's death.
The policy did not allow the Trust to withdraw money deposited into the Policy Account at will. Rather, upon Ms. Hobish's death, any money remaining in the Policy Account would revert to defendant. While defendant also sold AULII policies pursuant to which any money remaining in the account would revert to the policyholder upon death but imposed a higher monthly COI charge, the Trust chose the option with a lower COI charge. During the insured's lifetime, the policyholder could surrender the Policy Account, at which point defendant would return the account balance to the policyholder, less a surrender fee, and terminate the policy.
The monthly COI charges were determined by a formula known as the "COI Rate Scale." The rate scale in effect when the Trust purchased the policy in 2007 had been set by defendant in 2004. The terms of the policy expressly provided that defendant maintained the right to alter the COI Rate Scale and increase COI charges, but provided that any such increase must be "equitable to all policyholders of a given class." The policy also included a cap on monthly COI charges, which was linked to the insured's age.
In late 2015, defendant announced plans to change the COI Rate Scale that would apply to two groups of policies: those with death benefits above $1 million where the insured was 70-79 years old at the time of inception, and those above the same death benefit threshold where the insured was 80 or older at the time of inception. The parties sharply dispute the reasons for this change in the COI Rate Scale and the timing of defendant's decision to develop and implement the new scale. Defendant alleges that under the new scale, the COI charges applicable to the Trust's Policy Account would increase from approximately $7,000 to approximately $10,500 per month. Plaintiffs claim that this change would result in a drastic increase in the annual premium payments necessary to keep the policy in force. Plaintiffs do not contend, however, that the new COI Rate Scale exceeded the policy's cap on monthly charges.
Defendant began applying the new COI Rate Scale to the Trust's account in March 2016. After COI charges were imposed for four successive months, the Trust elected to surrender the policy "under protest." Pursuant to the terms of the policy, $412,688.01 was returned to the Trust, representing the remaining account balance less a $35,586.49 surrender fee.
In 2017, plaintiffs commenced this action in Supreme Court, alleging that defendant had breached the contract and violated General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business" (General Business Law § 349 [a]). With respect to their breach of contract claim, plaintiffs alleged that defendant's altered COI Rate Scale failed to increase rates in a manner "equitable to all policyholders of a given class," as the policy required. Plaintiffs noted that the policy described Ms. Hobish's "Rating Class" as "STANDARD NON-SMOKER," and argued that this category ("STANDARD NON-SMOKER") was the proper "class" for purposes of applying any COI charge increase, rather than the age-based groups that defendant had utilized. With respect to their section 349 claim, plaintiffs alleged that defendant had specifically marketed and sold AULII policies to elderly consumers with a representation that the likelihood of a COI Rate Scale change was minimal, all the while intending to raise COI charges in the future. Plaintiffs sought "compensatory, consequential, and punitive damages" for breach of contract; actual damages, attorney's fees, and punitive damages on their section 349 claim; and "other and further relief as the Court deems just and proper."
Supreme Court denied each party's motions for summary judgment on liability. On the contract claim, the court concluded that the contractual term in question—"a given class"—was ambiguous within the four corners of the contract, and that the parties had submitted relevant, competing extrinsic evidence that raised a triable issue of fact. As for the section 349 claim, the court held plaintiffs had sufficiently alleged they were affected by a deceptive business practice.
Supreme Court rejected various damages theories that plaintiffs had asserted as to both causes of action. Plaintiffs offered only one theory of consequential or compensatory damages: that they were entitled to the full value of the policy's $2 million death benefit, minus the surrender value, for a total of approximately $1.6 million. The court held that these damages were precluded because they did not "relate to any actual harm that resulted from AXA's alleged breach" (2022 NY Slip Op 32321[U], *14 [Sup Ct, NY County 2022]). Plaintiffs' claim for "actual damages" under General Business Law § 349 rested on the same theory, and Supreme Court held that the same logic precluded those damages (id. at *16-17). Plaintiffs also sought approximately $250,000 in restitutionary damages under section 349, which Supreme Court found was a "speculative" calculation as to what "would have been left on [*3]the Policy Account upon Ms. Hobish's hypothetical death," and was thus unavailable to plaintiffs (id. at *17-18). Finally, Supreme Court held that plaintiffs' allegations were insufficient as a matter of law to establish the availability of punitive damages for either claim, noting that plaintiffs had not pointed to any evidence of "AXA's scienter" or of evidence of actions "intended to defeat the contract" (id. at *18-19 [emphasis and internal quotation marks omitted]).
Plaintiffs appealed, and the Appellate Division affirmed. On damages, the Court held that Supreme Court properly dismissed plaintiffs' demand for damages in the amount of the full face value of the policy minus the surrender amount because plaintiffs "chose to exercise the surrender provisions of the policy" and thus "were no longer entitled to the $2 million death benefit" (225 AD3d 487, 488 [1st Dept 2024]). While precluding this measure of damages, the Appellate Division noted that "we do not . . . address the issue . . . of what damages may still be available for the alleged breach" (id.). The Court further held that restitutionary damages had been properly dismissed because they were too speculative and "never realized" (id. at 489). It affirmed dismissal of plaintiffs' punitive damages demand based on the breach of contract, and held that General Business Law § 349 (h) only allows for "limited punitive damages" of three times actual damages (id., quoting Karlin v IVF Am., 93 NY2d 282, 291 [1999]). The Appellate Division granted leave to appeal, and we now affirm.
The Appellate Division, in finding the contractual term "given class" ambiguous,
properly refused to grant plaintiffs summary judgment on their contract claim.
A court determines whether a contract is ambiguous by looking within the four corners of the document (see Kass v Kass, 91 NY2d 554, 566 [1998]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162-163 [1990]). Where a "reasonable basis for a difference of opinion" exists concerning the meaning of a contractual term, a court may find on summary judgment that the meaning of the term is ambiguous and raises a triable issue of fact (Selective Ins. Co. of Am. v County of Rensselaer, 26 NY3d 649, 655 [2016], quoting Greenfield v Philles Records, 98 NY2d 562, 569 [2002]).
The policy uses the term "class" twice: once referring to "a given class" in requiring defendant to raise rates only "on a basis that is equitable to all policyholders of a given class," and again in defining Ms. Hobish's "RATING CLASS" as "STANDARD NON-SMOKER." As the courts below held, one could reasonably conclude that a "given class" has two different meanings in the policy: first, that "given class" refers to the "rating class," delineated in all capitalized letters, which would tether rate increases to Ms. Hobish's particular rating class of "standard non-smoker"; or second, that use of two different phrases, "given class" and "rating class," implies that the terms are not equivalent, and that a "given class" therefore simply refers to any actuarially reasonable grouping of policies. Because plaintiffs cannot point to any other definition or provision of the contract, or any other "circumstances under which it was executed" that resolves this ambiguity (Kass, 91 NY2d at 566, quoting Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]), we agree with the lower courts that "a given class" is subject to two reasonable interpretations, and is thus ambiguous when considered within the four corners of the contract.
We also agree that the extrinsic evidence in the record fails to resolve the ambiguity, leaving a triable issue of fact, and therefore plaintiffs' reliance on the doctrine of contra proferentem is misplaced. Where inconclusive extrinsic evidence has been introduced by the parties concerning the meaning of an ambiguous term, that rule of contract construction does not automatically apply in favor of the insured at the summary judgment stage (see State of New York v Home Indem. Co., 66 NY2d 669, 671 [1985] [stating that the ambiguity "must be resolved against the insurer which drafted the contract" only when the "tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract"]; see also e.g. Dean v Tower Ins. Co. of N.Y., 19 NY3d 704, 707-709 [2012] [acknowledging that ambiguities in a contract should be construed against the insurer but concluding that ambiguity in the contract rendered summary judgment inappropriate]). As Supreme Court noted, the evidence submitted by defendant included the text of a New York regulation which defines "[c]lass of policies" as "all policies with similar expectations as to anticipated experience factors" (11 NYCRR 48.1 [e]), another definition of the term "policy class" derived from the Actual Standard of Practice guidelines, and two expert opinions suggesting that "a given class" simply refers to any actuarially permissible class of policies. Plaintiffs, for their part, submitted evidence from defendant's own "Illustrations" of policy details that refer to "the Standard Non-Tobacco User underwriting class" (Hobish, 2022 NY Slip Op 32321, *8-10). With these competing definitions in the record, significant ambiguity remains, and as a result we agree with the courts below that plaintiffs were not entitled to summary judgment on their contract claim.

We turn to plaintiffs' demand for compensatory and consequential damages, actual damages, and restitutionary damages.
Plaintiffs assert the same theory and amount for compensatory/consequential damages on their breach of contract claim and actual damages on their General Business Law § 349 claim: approximately $1.6 million, calculated as the value of the $2 million death benefit less the policy's surrender value. Under New York law, damages on a breach of contract claim are intended "to place the nonbreaching party in as good a position as it would have been had the contract been performed" (Brushton-Moira Cent. School Dist. v Thomas Assoc., 91 NY2d 256, 261 [1998]). Plaintiffs claim they are entitled to $1.6 million because defendant breached the policy and they therefore had a right to terminate the policy and sue for damages in the amount of the full face value.
This theory misconstrues the record. Upon defendant's alleged breach, plaintiffs did not terminate the insurance policy. Rather, they enforced it by opting to receive a defined contractual benefit—the surrender payment—and terminate the policy's coverage. And they did so deliberately, after extensive financial deliberations with various family members (see Hobish, 2022 NY Slip Op 32321, *14-15). Notably, the decision to take the surrender value allowed for the family to access otherwise unavailable funds that would not have reverted to the Trust upon Ms. Hobish's death. Had plaintiffs wanted to keep the policy in force and obtain the death benefit, they could have refused to pay any further premiums and allowed for COI charges to be deducted from the amount remaining in the account, or sued defendant for injunctive relief to prevent the draining of the policy account and subsequent acceleration of the COI charges under the new COI Rate Scale (see e.g. Inter-Power of N.Y. v Niagara Mohawk Power Corp., 259 AD2d 932, 934 [3d Dept 1999], lv denied 93 NY2d 812 [1999]). They did not pursue these options.
Plaintiffs contend that because Ms. Hobish was no longer insurable due to her age at the time defendant breached the policy by raising the COI rates, the appropriate measure of damages was the value of the policy (see Conlew, Inc. v Kaufmann, 269 NY 481, 490-491 [1936] [suggesting that, where a replacement policy is available, the appropriate measure of damages is the difference in value between the lost policy and the replacement policy, or, if the insured is not insurable, the "value of the policy lost"]; see also Whitehead v New York Life Ins. Co., 102 NY 143, 156-157 [1886]; Kenyon v National Life Assn., 39 App Div 276, 293-294 [4th Dept 1899]). But there was no wrongful cancellation or improper lapse in coverage entitling plaintiffs to treat the policy as terminated and sue for its full value (see Conlew, 269 NY at 490-491).
With respect to plaintiffs' demand for actual damages on the section 349 claim, although plaintiffs are correct that the theory of liability for a section 349 claim is not identical to a breach of contract claim, for the same reasons that plaintiffs' theory of compensatory and consequential damages fails on the facts presented here, it likewise fails to support plaintiffs' theory that the $1.6 million figure is a proper measure of plaintiffs' "actual damages," as required by section 349. Accordingly, we affirm the Appellate Division's dismissal of plaintiffs' demand for compensatory/consequential damages and actual damages based on a recovery of the death benefit, and do not address what consequential/compensatory or actual damages may still be available.
We agree with the Appellate Division that, to the extent some form of "restitutionary" damages may be available on their section 349 cause of action, the record here fails to support that claim.
IV.
We also affirm the Appellate Division's rejection of plaintiffs' request for punitive damages under their breach of contract and General Business Law § 349 claims.
A.
The bar for subjecting a defendant to punitive damages on a contract claim is high. Such damages are available only where "the fraud, aimed at the public generally, is gross and involves high moral culpability," or when it "evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations" (Walker v Sheldon, 10 NY2d 401, 405 [1961]). Although "damages arising from the breach of a contract will ordinarily be limited to the contract damages necessary to redress the private wrong, . . . punitive damages may be recoverable if necessary to vindicate a public right" (New York Univ. v Continental Ins. Co., 87 NY2d 308, 315 [1995]; see Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603, 613 [1994]). To state a claim for punitive damages in this context, a plaintiff must allege that "(1) [the] defendant's conduct [is] actionable as an independent tort; (2) the tortious conduct [is] of the egregious nature set forth in Walker. . . ; (3) the egregious conduct [is] directed to [the] plaintiff; and (4) it [is] of a pattern directed at the public generally" (New York Univ., 87 NY2d at 316).
Plaintiffs have not cleared Walker's high bar. They claim that defendant fraudulently induced the Trust to purchase the policy by instructing its sales representative to make false representations about the likelihood of a future COI charge increase when in fact defendant had already decided to alter the COI Rate Scale. First, and most significantly, no party disputes that the policy at issue expressly stated that the COI charges could potentially be increased, and clearly delineated guaranteed maximum COI charges that defendant could apply to the Policy Account. The new COI Rate Scale developed in 2015 resulted in charges below the policy's maximum limits. Second, the record evidence relied upon by plaintiffs fails to raise a triable issue concerning whether defendant's behavior was so egregious, wanton, or malicious as to warrant punitive damages. For example, plaintiffs' principal source of record information on defendant's sales strategies for its AULII policies is the deposition testimony of the salesperson, but that testimony is equivocal and provides no specific communication or statement from defendant that accords with plaintiffs' allegations of wanton fraud. Although plaintiffs claim that defendant planned to increase COI deductions as early as 2007, unrebutted deposition testimony established that any decision to raise the COI Rate Scale would always be "contingent on the actual work being performed," and that no recommendation to increase rates was ever approved by defendant in 2007. On this record, defendant's conduct falls short of the standard set forth in Walker (10 NY2d at 404-405), and plaintiffs have failed to demonstrate entitlement to punitive damages on the contract claim.
B.
With respect to plaintiffs' demand for punitive damages under section 349 (h), the parties dispute whether this remedy is available at all. Section 349 (h) authorizes a private person to bring a General Business Law § 349 action and permits a court to increase an award of damages "to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section." The Appellate Division below concluded that a court could not award damages beyond these "limited punitive damages" and dismissed the claim on that basis, relying on this Court's decision in Karlin (225 AD3d at 489, quoting Karlin, 93 NY2d at 291). The Second Department has taken the opposite view, allowing a claim for punitive damages to proceed without reference to the statutory cap (see Wilner v Allstate Ins. Co., 71 AD3d 155 [2d Dept 2010]), and the Fourth Department appears to have taken internally divergent positions on the question (compare Bristol Harbour Assoc. v Home Ins. Co., 244 AD2d 885, 885-886 [4th Dept 1997], with JD & K Assoc., LLC v Selective Ins. Group, Inc., 118 AD3d 1402, 1403-1404 [4th Dept 2014]). Federal courts applying New York law have likewise divided on the issue of punitive damages (compare Guzman v Mel S. Harris & Assocs., LLC, 2018 WL 1665252, *13, 2018 US Dist LEXIS 49622, *31 [SD NY, Mar. 22, 2018, 16 Civ. 3499 (GBD)] ["Plaintiff's punitive damages on [his General Business Law § 349] claim are limited to $1,000"], and Bristol Vil., Inc. v Louisiana-Pacific Corp., 916 F Supp 2d 357, 370 [WD NY 2013], with Koch v Greenberg, 14 F Supp 3d 247, 278-279 [SD NY 2014] ["(I)t is clear that in New York the GBL's treble damages provision does not proscribe an additional award of punitive damages"], citing Wilner, 71 AD3d at 167; see generally Bueno v LR Credit 18, LLC, 269 F Supp 3d 16, 19-23 [ED NY 2017] [describing the arguments on both sides of the issue and collecting cases]). The issue is squarely presented here, as is the need to resolve it (see Fritz v LVNV Funding, LLC, 587 F Supp 3d 1, 7 [ED NY 2022] [noting the "absence of a clear answer by the New York Court of Appeals" on the punitive damages issue])[FN1]. We do so by holding that punitive damages for section 349 (h) claims are limited to the treble damages provided by the statute.
General Business Law § 349 applies to virtually all economic activity, and its "application has been correspondingly broad" (Karlin, 93 NY2d at 290). Initially, section 349 allowed for enforcement solely by the Attorney General, with restitution and injunctive relief the only available remedies (L 1970, ch 43, § 2). In 1980, a private right of action was added "[t]o ensure the broadest enforcement of the statute" (Himmelstein, McConnell, [*4]Gribben, Donoghue & Joseph, LLP v Matthew Bender & Co., Inc., 37 NY3d 169, 176 [2021]). That section provides:
"In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff" (L 1980, ch 346, § 1).
It is well settled that, while the statute may "cover conduct 'akin' to common-law fraud" (Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201, 209 [2001]), claims under this provision of General Business Law § 349 are "creature[s] of statute based on broad consumer-protection concerns" (Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330, 343 [1999]; see Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co., 89 NY2d 214, 220-221 [1996] [distinguishing between claims with a common-law source codified by statute and claims that "would not exist but for the statute"]; Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 24-25 [1995]). Accordingly, in determining whether punitive damages are available to a private plaintiff bringing a General Business Law § 349 claim, "we look to the statute—not to whether the nature of the wrong alleged would permit recovery under traditional concepts of punitive damages in tort law" (Thoreson v Penthouse Intl., 80 NY2d 490, 496 [1992]).
We turn first to the text of the private right of action provision. The statute provides for layered damages: actual damages, or fifty dollars, whichever is greater; discretionary treble damages up to a cap of $1,000; and attorney's fees (see General Business Law § 349 [h]). There is no reference to "punitive damages" in the statute, although treble damages are viewed as having some punitive effect (see Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 NY3d 332, 385 [2020], citing Vermont Agency of Natural Res. v United States ex rel. Stevens, 529 US 765, 786 [2000] [" 'The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers,' " quoting Texas Indus., Inc. v Radcliff Materials, Inc., 451 US 630, 639 (1981)]; see also State of N.Y. ex rel. Grupp v DHL Express (USA), Inc., 19 NY3d 278, 286 [2012] ["Thus, rather than redressing the harm actually suffered, the statute's imposition of civil penalties and treble damages evinces a broader punitive goal of deterring fraudulent conduct against the State"]). Treble damages under section 349(h) are more easily proved than traditional punitive damages but are restricted in value. On the one hand, the statute provides a standard for treble damages—"willful and knowing"—that is substantially less onerous than the general standard for punitive damages (see e.g. Prozeralik v Capital Cities Communications, 82 NY2d 466, 479 [1993] ["Punitive damages are awarded in tort actions '(w)here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime,' " quoting Prosser & Keeton, Torts § 2 at 9 [5th ed 1984]). At the same time, the provision limits those damages to a hard cap of $1,000 and gives the court discretion in awarding them even if the lower standard is met.
The balanced remedies reflect compromises reached in the legislative process that produced the private right of action (see Letter from Chair of Standing Comm on Consumer Protection to Governor, May 23, 1980 at 1, Bill Jacket, L 1980, ch 346 [explaining that the bill "represents years of negotiation and compromise by business and consumer groups in pursuing a 'private right of action' for our citizens [and] [i]t is my belief that a fair balance has been struck in this bill"]; compare Letter from Commissioner of Dept of Commerce to Governor, May 21, 1980 at 1, Bill Jacket, L 1980, ch 346 [urging the Governor to veto the bill because it "would subject businesses, particularly small businesses, to numerous claims by allowing individuals to recover at least $50.00 plus attorneys' fees"], with Mem from New York Public Interest Research Group, Bill Jacket, L 1980, ch 346 ["The prospect of paying a high damage award will make deception extremely unprofitable"]). The balance struck provides a private right of action that complemented the Attorney General's enforcement power but limits the range of available damages.
In the 44 years since the private right of action was added to the statute, the legislature has not altered that balance, leaving the provisions in section 349 (h), including the monetary caps, unchanged. By contrast, similar provisions have been updated to increase penalties. In 1980, when section 349 (h) was adopted, the legislature also added a private right of action for false advertising claims under General Business Law § 350-d (subsequently [*5]reorganized to § 350-e) in a companion bill with an identical damages provision (see Letter from Attorney General to Governor, June 10, 1980 at 1, Bill Jacket, L 1980, ch 346). In 2007, the penalties were increased ten-fold for false advertising claims brought under General Business Law § 350-d, allowing for "actual damages or five hundred dollars, whichever is greater" and raising the limit for treble damages to ten thousand dollars (L 2007, ch 328, § 1). Likewise, in 2010, the legislature enacted an "energy services consumers bill of rights" (L 2010, ch 416, § 1) containing a private right of action for consumers with the same enhanced penalties as the amended section 350-d (see General Business Law § 349-d; see also Carrie Scrufari, The Lights are on: Shining a Spotlight on the Retail Energy Market Reveals the Need for Enhanced Consumer Protections, 29 Fordham Envtl L Rev 349, 369 n 103 [2018]).[FN2]
No corresponding increase or adjustment has yet been made for remedies available under section 349 (h), despite numerous proposals to do so (see 2017 NY Senate-Assembly Bill S435, A5247; 2015 NY Senate-Assembly Bill S1273, A1161; 2013 NY Senate-Assembly Bill S56, A312; 2011 NY Senate-Assembly Bill S74, A8381; 2009 NY Senate-Assembly Bill S7301, A10306). Among other things, these proposed amendments would have lifted the cap on actual damages from $50 to $500 and, with respect to treble damages,
from $1,000 to $10,000 (id.). Moreover, the amendments would have specifically allowed for punitive damages, proposing that "[t]he court may . . . award punitive damages in an amount not to exceed three times the actual damages" (id.)
In sum, the legislature carefully calibrated damages at the time section 349 (h) was enacted. We decline to alter that balance by making available a remedy that goes far beyond what the legislature contemplated. As evidenced by the increased penalties on similar statutes, the legislature will act where it believes current remedies are insufficient. It has not done so here. We therefore conclude that punitive damages in addition to the treble damages delineated in section 349 (h) are unavailable.
Accordingly, the order of the Appellate Division insofar as appealed from should be affirmed, with costs, and the certified question answered in the affirmative.

HALLIGAN, J. (concurring):

I part ways with the majority's insistence on deciding an important question of statutory interpretation that readily could be resolved on other grounds. The parties dispute whether General Business Law § 349 (h) permits punitive damages beyond the treble multiplier of actual damages up to one thousand dollars expressly authorized in the statute. But neither side offers more than a glancing analysis of this question. They spar about the import of dicta in our decision in Karlin v IVF America, Inc. (93 NY2d 282, 291 [1999]), a law review note written more than forty [*6]years ago, and a handful of decisions from state and federal courts, all of which offer barebones analysis. Neither party actually examines the legislative history of this particular provision or section 349 more broadly. Nor do we have before us the views of the New York Attorney General, who has weighed in on numerous other cases involving section 349's scope (e.g. Karlin, 93 NY2d 282; Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330 [1999]; Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201 [2001]; Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc., 3 NY3d 200 [2004]; Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314 [2002]; Plavin v Group Health Inc., 35 NY3d 1 [2020]; Collazo v Netherland Prop. Assets LLC, 35 NY3d 987 [2020]; Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v Matthew Bender & Co., Inc., 37 NY3d 169 [2021]).
The majority nonetheless forges ahead. It decides that section 349 (h) bars punitive damages beyond the capped treble damages, pointing to a few letters declaring that the enactment of a private right of action under section 349 represented a compromise between business and consumer groups, and the absence of any subsequent amendment expressly authorizing punitive damages. Perhaps that is indeed what the Legislature intended. There are signs that point in the other direction, though. For starters, one of the letters from the Bill Jacket that the majority itself relies on stresses that "[t]he prospect of paying a high damage award will make deception extremely unprofitable" (majority op at 16, quoting Memorandum from Public Interest Research Group, Bill Jacket, L 1980, ch 346). That understanding squares with the potential for punitive damages, not just actual damages (which may be "difficult to establish," see Memorandum for the Governor from Department of Law of June 10, 1980 at 2, Bill Jacket, L 1980, ch 346) or a cap of one thousand dollars. Along the same lines, contemporaneous reports underscore industry's concerns that expanded liability for a private right of action could yield "an award of substantial damages" (New York Law Journal Report of March 17, 1980, at 5, Bill Jacket, L 1980, ch 346), which suggests that any compromise between business and consumer groups may not have excluded punitive damages.
The majority also asserts that treble damages "hav[e] some punitive effect" (majority op at 15). The import of this is unclear; perhaps the majority believes this effect explains why no punitive damages are available. In any event, the majority ignores that treble damages may be intended to deter particular statutory violations or to ensure rigorous and robust private enforcement, in addition to simply punishing egregious misconduct (see American Soc. of Mechanical Engineers, Inc. v Hydrolevel Corp., 456 US 556, 574-576 [1982] [noting that the federal Sherman Act's private right of action was created "primarily as a remedy for the victims of antitrust violations," and treble damages "make the remedy meaningful by counter-balancing 'the difficulty of maintaining a private suit' " under antitrust laws (internal citations omitted)] and Sperry v Crompton Corp., 8 NY3d 204, 214 [2007] [the New York Donnelly Act's uncapped treble damages provision "necessarily punishes antitrust violations, deters such behavior . . ., or encourages plaintiffs to commence litigation—or some combination of the three"]). Statements in the bill jacket for section 349 (h) make the same point (see Letter from Department of Consumer Affairs of May 22, 1980 at 1, Bill Jacket, L 1980, ch 346 [the bill "provide(s) enforcement machinery for communities or areas of the state where there are no active consumer service organizations"]; and Statement from Assemblyman Jose E. Serrano of March 10, 1980, at 1, Bill Jacket, L 1980, ch 346 ["The Attorney General cannot possibly adequately police the market alone"]). Thus, the inclusion of a treble damages remedy capped at one thousand dollars sheds little light on whether the Legislature intended that punitive damages would nonetheless be available to punish wrongdoers, as the Legislature could have instead primarily intended treble damages to serve a deterrent effect or incentivize private enforcement. None of these questions are addressed by the parties.
Nor does the majority discuss numerous other points that might bear on the meaning of section 349 (h). To note a few: Is our decision in Thoreson, on which plaintiff relies, best read as broadly holding that remedies otherwise available at common law are never available for a statutorily created cause of action unless explicitly delineated, or more narrowly, as tethered to the legislature's intent in enacting the NYSHRL (see Thoreson v Penthouse International, Ltd., 80 NY2d 490 [1992])? How does the absence of a scienter requirement for a General Business Law § 349 (h) claim affect the availability (or lack thereof) of punitive damages? What is the import of prior cases from this Court holding that courts are not limited to the remedies specified under the Martin Act or Executive Law § 63 (12) (see e.g. People v Greenberg, 27 NY3d 490, 497 [2016], citing People v Lexington Sixty-First Assoc., 38 NY2d 588 [1976])? How might the majority's decision affect remedies available for other state law provisions that include a treble damages option (e.g. General Business Law § 340 [5] [Donnelly Act]; General Business Law § 628 [1] [health club services]; General Business Law § 206 [hotel overcharges]; General Business Law § 458-i[credit services businesses])? What, if anything, should we make of the recent introduction of bills in the state legislature to add punitive damages explicitly to GBL 349?
Granted, other courts have divided on the question whether punitive damages are available under section 349 (h), and it is preserved for our review. But that does not mean that we "need to resolve it" here and now, as the majority blithely asserts (majority op at 13), because an alternative ground is right before us. In explaining why punitive damages are not available for plaintiff's breach of contract claim, the majority concludes that plaintiffs simply have not raised a triable issue of fact as to the type of egregious, deliberate conduct that has long been the hallmark of punitive damages (majority op at 10-12; see e.g. Prozeralik v Capital Cities Communications, 82 NY2d 466, 479 [1993], quoting Prosser & Keeton, Torts § 2 at 9 [5th ed 1984]; Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603, 613 [1994]). That is an easy call, especially since the charges at issue were less than the cap included in the policy. I believe that conclusion forecloses punitive damages, period—whether for plaintiff's breach of contract claim, section 349 claim, or any other claim that might give rise to such damages.
I do not understand the majority's insistence on reaching an issue that is meagerly briefed and presents arguments that neither the parties nor the majority have addressed. Courts often decide questions on narrow grounds and reserve harder issues for another day. And our Court regularly "considers only those arguments . . . which arise by necessity in our analysis of the questions explicitly presented" (Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 NY3d 377, 403 n [2017] [Rivera, J., concurring] [emphasis added]). Such judicial modesty is especially prudent where an issue has not been fully subjected to the crucible of the adversarial process and there is a sufficient alternative ground for deciding the case. Thus, "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further" (PDK Laboratories Inc. v United States Drug Enforcement Admin., 362 F3d 786, 799 [DC Cir 2004] [Roberts, J., concurring in part and concurring in the judgment]). Anything more is a "gratuitous ride" (id.), and one that I would not embark upon here.
Order insofar as appealed from affirmed, with costs, and certified question answered in the affirmative. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur. Judge Halligan concurs in result in an opinion, in which Chief Judge Wilson and Judge Rivera concur.
Decided January 14, 2025

Footnotes

Footnote 1: While we appreciate our concurring colleagues' concern over "judicial modesty" (concurring op at 6), the issue of the availability punitive damages was preserved, was decided by the Appellate Division, and was briefed to this Court. Given the split at the Appellate Division over whether such damages are available under General Business Law section 349 (h) and the uncertainty in federal courts that are called upon to apply the New York statute, we see resolution of the issue as an institutional responsibility, not a " 'gratuitous ride' " (concurring opinion at 6, quoting PDK Labs., Inc. v United States Drug Enforcement Admin., 362 F3d 786, 799 [DC Cir 2004] [Roberts, J., concurring in part and concurring in judgment]). 

Footnote 2: In 1996, the legislature added an "[a]dditional civil penalty for consumer frauds against elderly persons" of up to ten thousand dollars (L 1996, ch 687, § 1 [formerly General Business Law § 349-j, now General Business Law § 349-c]; see generally State of New York v Justin, 3 Misc 3d 973, 993 [Sup Ct, Erie County 2003]).